1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4
                                    )  CR-15-00236 LHK
5       UNITED STATES OF AMERICA,    )
                                     )  SAN JOSE, CALIFORNIA
6                    PLAINTIFF,      )
                                     )  AUGUST 14, 2017
7              VS.                   )
                                     )  VOLUME 2
8       ERIC POTRATZ,               )
                                     )  PAGES 20-76
9                    DEFENDANT.      )
       _____ )  **PARTIAL TRANSCRIPT**
10

11                  PARTIAL TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE LUCY H. KOH
12                 UNITED STATES DISTRICT JUDGE

13

14      A P P E A R A N C E S:

15      FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                                BY:  MATTHEW A. PARRELLA
16                                   JOSEPH E. SPRINGSTEEN
                                150 ALMADEN BOULEVARD, SUITE 900
17                              SAN JOSE, CALIFORNIA  95113

18      ALSO PRESENT:          HILARY RICKHER
                               LAKISHA HOLLIMAN
19

20      FOR THE DEFENDANT:     FEDERAL PUBLIC DEFENDER'S OFFICE
                               BY:  GRAHAM ARCHER
21                             55 SOUTH MARKET STREET, SUITE 820
                               SAN JOSE, CALIFORNIA  95113
22

ALSO PRESENT:          CHELSEA VAN AKEN
23

       OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
24                                 CERTIFICATE NUMBER 9595

25           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER

1

2                            INDEX OF WITNESSES

3      GOVERNMENT'S

4      **JEFF NOVITZKY**
            DIRECT EXAM BY MR. PARRELLA (RESUMED)    P. 20
5           CROSS-EXAM BY MR. ARCHER                 P. 33
            REDIRECT EXAM BY MR. PARRELLA            P. 65
6           RECROSS-EXAM BY MR. ARCHER               P. 72

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SAN JOSE, CALIFORNIA                    AUGUST 14, 2017

 2                   P R O C E E D I N G S

 3   ///

 4   ///

 5            THE COURT:  ALL RIGHT.  CAN YOU PLEASE HAVE YOUR

 6   WITNESS TAKE THE STAND?

 7            MR. PARRELLA:  YES.

 8            THE COURT:  AND YOU ARE STILL UNDER OATH,

 9   MR. NOVITZKY.

10       (GOVERNMENT'S WITNESS, JEFF NOVITZKY, WAS PREVIOUSLY

11   SWORN.)

12            THE WITNESS:  YES, YOUR HONOR.

13            THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

14            MR. PARRELLA:  THANK YOU, YOUR HONOR.

15                 DIRECT EXAMINATION (RESUMED)

16   BY MR. PARRELLA:

17   Q.   GOOD MORNING.

18   A.   GOOD MORNING.

19   Q.   SO WE ARE -- WE WERE LISTENING TO EXHIBIT 73, AND IF YOU

20   COULD TAKE 73A, WHICH IS THE AID, THE TRANSCRIPT, TAKE A MOMENT

21   AND TURN TO THAT.

22   A.   I'M SORRY.

23   Q.   OKAY.  THANK YOU.

24        CAN WE START?  START ON -- THE BEGINNING OF PAGE 14.  I'M

25   SORRY, 12.
```

1          (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

2     BY MR. PARRELLA:

3     Q.   SO MR. NOVITZKY, WHAT PRODUCT WERE YOU TALKING ABOUT HERE

4     WITH THE DHEA?

5     A.   I DON'T RECALL WHICH ONE IT WAS.

6     Q.   WELL, LET ME ASK YOU THIS, WAS IT THE TURINABOL-LV?

7     A.   NO.

8     Q.   SO IT WAS SOME DIFFERENT PRODUCT?

9     A.   YEAH, IT WAS THE NEW PRODUCTS HE HAD.  MY RECOLLECTION IS

10    IT WAS THE NEW PRODUCTS HE HAD COMING ON.

11    Q.   THE ANDRO SERIES?

12    A.   CORRECT.

13          MR. PARRELLA:  OKAY.  WE CAN PICK UP.

14          (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

15          MR. PARRELLA:  CAN YOU STOP IT?

16    Q.   SO MR. NOVITZKY, WHAT WERE YOU REFERRING TO WHEN YOU SAID

17    "THE BODY WOULD STOP PRODUCTION OF IT"?

18    A.   TESTOSTERONE.  SO LIKE WE TALKED ABOUT ON FRIDAY --

19    Q.   CAN YOU USE THE MICROPHONE, PLEASE.

20    A.   ONE OF THE SIDE EFFECTS OF USING ANABOLIC STEROIDS IS

21    THERE'S SO MUCH FOREIGN SOURCE OF STEROID IN THE BODY, YOUR

22    BODY TENDS TO NATURALLY STOP THE PRODUCTION OF IT.  AND IF YOU

23    STAY ON IT TOO LONG, THE BODY COULD PERMANENTLY STOP PRODUCTION

24    OF TESTOSTERONE.

25          SO THAT'S WHY THE TERM "CYCLE "IS USED.  YOU USE THE

1    STEROID FOR A PERIOD OF TIME AND THEN GET OFF IT FOR A PERIOD

2    OF TIME TO GET YOUR BODY TO RESTART ITS OWN NATURAL PRODUCTION.

3    Q.   AND SO WHAT DID YOU -- WHAT DOES THE TERM "BOUNCE BACK" --

4    OR, I'M SORRY, YOU USED THE TERM "KICK START THE BODY."  WHAT

5    DID YOU MEAN BY THAT?

6    A.   YEAH, KICK START THE NATURAL PRODUCTION OF TESTOSTERONE.

7    Q.   IS THAT A TYPICAL USE IN ANABOLIC STEROID CYCLING, TO USE

8    ANOTHER DRUG TO KICK START THE PRODUCTION OF NATURAL

9    TESTOSTERONE?

10   A.   YEAH.  THERE ARE OTHER DRUGS CALLED POST-CYCLE THERAPY

11   DRUGS WHICH WOULD BE AN ARTIFICIAL WAY TO HELP YOUR BODY

12   START -- IN KICK STARTING PRODUCTION.

13        OR OTHER PEOPLE JUST GET OFF FOR A PERIOD OF TIME AND

14   NATURALLY THE BODY WILL START PRODUCING AGAIN.  I'VE SEEN

15   INSTANCES OF ATHLETES WHO HAVE BEEN ON STEROIDS FOR EXTENDED

16   PERIODS OF TIME --

17             MR. ARCHER:  OBJECTION.  RELEVANCE AND OUTSIDE OF LAY

18   OPINION.

19             THE COURT:  OVERRULED.

20        GO AHEAD, PLEASE.

21             THE WITNESS:  -- AND HAVEN'T CYCLED OFF FREQUENTLY

22   ENOUGH, AND IN SOME CASES THOSE ATHLETES' BODIES PERMANENTLY

23   STOP PRODUCING TESTOSTERONE.  AND AS THOSE ATHLETES GET OLDER,

24   THEY'RE REQUIRED NOW -- IT'S KIND OF IRONIC THAT THEY WERE ON

25   STEROIDS BY CHOICE EARLIER IN THEIR LIFE, BUT AS THEY GET

Case 5:15-cr-00236-LHK  Document 139  Filed 08/18/17  Page 6 of 60

```
 1        OLDER, THEY'RE REQUIRED TO BE ON THEM --

 2              MR. ARCHER:  OBJECTION.  RELEVANCE, TESTIFYING IN A

 3        NARRATIVE.

 4              THE COURT:  OVERRULED.

 5        BY MR. PARRELLA:

 6        Q.   SO MR. NOVITZKY, YOU MENTIONED SOMETHING CALLED POST-CYCLE

 7        THERAPY.  IS THAT ALSO REFERRED TO AS PCT?

 8        A.   YES, IT IS.

 9              MR. PARRELLA:  OKAY.  SO LET'S PICK UP WHERE WE WERE.

10         (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

11              MR. PARRELLA:  STOP IT.

12        Q.   SO WHAT WERE YOU REFERRING WHEN YOU SAID "GYNO" OR "BITCH

13        TITS"?  WHAT DOES THAT MEAN IN THIS TERM?

14        A.   A CONDITION WHEREBY MALES WHO USED ANABOLIC STEROIDS WILL

15        OFTEN DEVELOP FEMALE BREAST TISSUE, GYNECOMASTIA, I THINK IT'S

16        CALLED.

17        Q.   AND IT'S REFERRED TO AS GYNO?

18        A.   CORRECT.

19        Q.   WHAT ABOUT THE ACNE?

20        A.   ANOTHER SIDE EFFECT OF ANABOLIC STEROID USE.

21        Q.   OKAY.  SO LET'S PICK UP AGAIN.

22         (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

23              MR. PARRELLA:  CAN YOU STOP FOR A MINUTE?

24        Q.   SO MR. NOVITZKY, WHAT DID YOU UNDERSTAND THE MILD

25        ELEVATIONS WITH REGARDS TO THE LIVER TO BE REFERRING TO?
```

```
 1    A.   LIVER INJURIES ARE USUALLY MEASURED IN ENZYMES IN BLOOD

 2    TESTS.  SO I'VE SEEN MANY ATHLETES OVER THE YEARS USING

 3    STEROIDS HAVE VERY HIGHLY ELEVATED LIVER ENZYMES WHICH ARE

 4    EXCRETED WHEN THERE'S AN INJURY TO THE LIVER, WHICH ANABOLIC

 5    STEROIDS TEND TO DO.

 6              MR. PARRELLA:  OKAY.

 7         (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

 8              MR. PARRELLA:  OKAY.  THANK YOU.

 9    Q.   YOU CAN SET 73A ASIDE FOR A MOMENT.

10         SO, MR. NOVITZKY, DID THE INVESTIGATION CONTINUE AFTER

11    THAT TELEPHONE CALL?

12    A.   YES.

13    Q.   AND WAS SPECIAL AGENT HILARY RICKHER IN CHARGE AT THAT

14    POINT?

15    A.   SHE WAS.

16    Q.   DID YOU CONTINUE TO ASSIST?

17    A.   YES.

18    Q.   DID THERE COME A TIME WHEN THERE WAS A SEARCH WARRANT

19    APPLIED FOR FOR THE LOCATION OF PRIMORDIAL PERFORMANCE IN

20    PORTLAND?

21    A.   YES.

22    Q.   DO YOU RECALL WHEN THAT WAS?

23    A.   I DON'T.

24    Q.   OKAY.  DOES OCTOBER 30TH, 2012, SOUND FAMILIAR?

25    A.   THAT SOUNDS RIGHT.
```

1    Q.   OKAY.  DID YOU DRAFT THAT SEARCH WARRANT?

2    A.   NO.

3    Q.   OKAY.  DID YOU GET IT SIGNED BY THE MAGISTRATE OR

4    ANYTHING?

5    A.   NO, I DIDN'T.

6    Q.   OKAY.  WERE YOU PRESENT AT THE EXECUTION OF THAT SEARCH

7    WARRANT?

8    A.   I WAS PRESENT, YES.

9    Q.   AND JUST VERY BRIEFLY, WHAT WAS AGENT RICKHER'S ROLE AT

10   THAT SEARCH WARRANT?

11   A.   WELL, AGENT RICKHER WAS THE CASE AGENT, AND I GUESS YOU'D

12   CALL HER THE TEAM LEADER OF THE SEARCH WARRANT BECAUSE IT WAS

13   HER INVESTIGATION.

14        A SEARCH WARRANT IS VERY DYNAMIC.  THERE'S MANY DECISIONS

15   THAT HAVE TO HAPPEN DURING THE DAY, WHETHER OR NOT A PIECE OF

16   EVIDENCE FITS UNDER WHAT THE JUDGE AUTHORIZES TO BE SEIZED.

17        SO AGENT RICKHER, DURING THAT DAY, IS CONSTANTLY BEING

18   APPROACHED BY AGENTS DOING SEARCHING ABOUT ADVICE OF WHETHER

19   SOMETHING SHOULD BE TAKEN, OR JUST BASICALLY CALLING THE SHOTS

20   OF HOW THE SEARCH WARRANT IS EXECUTED.

21   Q.   OKAY.  AND WERE YOU PRESENT?

22   A.   I WAS PRESENT, YES.

23   Q.   AND DID YOU TAKE PART IN AN INTERVIEW OF AN INDIVIDUAL YOU

24   CAME TO KNOW AS ERIC POTRATZ?

25   A.   YES, I DID.

1    Q.   AND WHERE DID THAT HAPPEN AND APPROXIMATELY WHEN?

2    A.   THAT HAPPENED A LITTLE BIT AFTER THE EXECUTION.  WE MADE

3    ENTRY INTO PRIMORDIAL PERFORMANCE IN THE MORNING AND

4    MR. POTRATZ WAS NOT THERE.  AN EMPLOYEE CONTACTED HIM AND HE

5    SHOWED UP MAYBE ABOUT AN HOUR LATER.  SO MY RECOLLECTION WAS

6    9:30, 9:45, AND WE DID IT IN A CONFERENCE ROOM WITHIN THE

7    LOCATION OF PRIMORDIAL PERFORMANCE.

8    Q.   BY THE WAY, DO YOU SEE ERIC POTRATZ IN THE COURTROOM

9    TODAY?

10   A.   YES, I DO.

11   Q.   CAN YOU POINT HIM OUT, PLEASE?

12   A.   YEP, SITTING THERE IN THE BLUE SHIRT, COLLARED BLUE SHIRT

13   AT THE DEFENSE TABLE.

14          MR. PARRELLA:  OKAY.  INDICATING THE DEFENDANT, YOUR

15   HONOR, FOR THE RECORD.

16          THE COURT:  SO REFLECTED.

17      GO AHEAD.

18   BY MR. PARRELLA:

19   Q.   SO TELL US, HOW DID THE INTERVIEW BEGIN?

20   A.   THE INTERVIEW STARTED, WE INTRODUCED OURSELVES, MYSELF AND

21   AGENT RICKHER TOOK PLACE IN THE INTERVIEW.  WE INTRODUCED

22   OURSELVES TO MR. POTRATZ, TOLD HIM WE'D LIKE HIM TO ASK -- WE'D

23   LIKE TO ASK HIM SOME QUESTIONS AND INFORMED HIM ABOUT WHAT THIS

24   INVESTIGATION WAS ABOUT.

25          WE THEN ASKED HIM TO SIGN A DECLARATION ACKNOWLEDGING THAT

1    HE HAD RIGHTS, EVEN THOUGH HE WASN'T IN CUSTODY, THAT HE HAD

2    NON-CUSTODIAL RIGHTS.  INITIALLY HE DIDN'T WANT TO DO THAT AND

3    WE SAID, "OKAY.  WELL, IF YOU'RE NOT GOING TO DO THAT, THEN

4    WE'RE NOT GOING TO ASK YOU QUESTIONS.  WE WANT YOU TO

5    ACKNOWLEDGE IN WRITING THAT YOU'RE AWARE OF THESE RIGHTS THAT

6    YOU HAVE, AND IF YOU DON'T WANT TO DO THAT, THEN WE WON'T

7    CONDUCT THE INTERVIEW."

8        HE THEN CHANGED HIS MIND AND SAID THAT HE WOULD

9    ACKNOWLEDGE THAT HE WAS AWARE OF THESE RIGHTS THAT HE HAD.

10   Q.   OKAY.  BY THE WAY, WAS MR. POTRATZ UNDER ARREST AT THAT

11   TIME?

12   A.   NO.  AND WE MADE IT CLEAR TO HIM THAT HE WASN'T UNDER

13   ARREST, THAT HE COULD LEAVE AT ANY TIME, THAT HE DIDN'T HAVE TO

14   ANSWER THE QUESTIONS THAT WE WERE ASKING.  HE KNEW THAT.

15   Q.   WAS HE RESTRAINED IN ANY WAY?

16   A.   NO, HE WAS NOT.

17   Q.   OKAY.  DID YOU TAKE HIS CELL PHONE AWAY OR ISOLATE HIM IN

18   ANY WAY?

19   A.   WE DID NOT, OTHER THAN WE WERE IN A CONFERENCE ROOM.  BUT

20   HE WAS FREE TO COME AND GO FROM THE CONFERENCE ROOM AS HE

21   LIKED.

22   Q.   AND WAS IT, FROM THE FDA'S SIDE, JUST YOU AND

23   AGENT RICKHER?

24   A.   YES.

25   Q.   OKAY.

1     A.   IN THE ROOM, IN THE CONFERENCE ROOM.  THERE WERE MANY

2     AGENTS THROUGHOUT PRIMORDIAL.

3     Q.   OKAY.  SO MR. NOVITZKY, I WANT TO GO THROUGH THE

4     INTERVIEW.

5          AND, YOUR HONOR, I'VE CONFERRED WITH COUNSEL, AND RATHER

6     THAN REFRESHING RECOLLECTION INDIVIDUALLY, WE'VE AGREED TO HAVE

7     A REPORT AVAILABLE FOR THE WITNESS, IF THAT'S ALL RIGHT WITH

8     THE COURT.

9              THE COURT:  IS THAT OKAY WITH THE DEFENSE,

10    MR. ARCHER?

11             MR. ARCHER:  YES, YOUR HONOR, NO OBJECTION.

12             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

13             MR. PARRELLA:  THIS IS BATES STAMPED 4318 (HANDING).

14             THE WITNESS:  THANKS.

15    BY MR. PARRELLA:

16    Q.   SO MR. NOVITZKY, I'VE HANDED YOU A REPORT OF INTERVIEW; IS

17    THAT CORRECT?

18    A.   YES.

19    Q.   INVOLVING ERIC POTRATZ ON OCTOBER 30TH, 2012?

20    A.   CORRECT.

21    Q.   SO PLEASE REFER TO THAT ONLY TO REFRESH YOUR RECOLLECTION,

22    AND THEN LOOK UP AND ANSWER THE QUESTIONS.  PLEASE REFRAIN FROM

23    READING FROM IT OUT LOUD BECAUSE WE WANT YOUR RECOLLECTION.

24         FAIR ENOUGH?

25    A.   GOT IT.

1      Q.   OKAY.  SO LET'S TURN TO -- WHAT WAS -- YOU DISCUSSED THE,

2      THE ISSUE OF THE RIGHTS, AND JUST TO CONCLUDE THAT, DID

3      MR. POTRATZ SIGN A WAIVER OF THOSE RIGHTS?

4      A.   HE DID.

5      Q.   OKAY.  AND ABOUT WHAT TIME WAS THAT, IF YOU RECALL?

6      A.   IT WAS AROUND 9:56 A.M.

7      Q.   AND SO DID YOU TALK ABOUT WHO -- WITHDRAWN.

8           DID YOU TALK ABOUT THE OWNERSHIP AND CONTROL OF

9      PRIMORDIAL PERFORMANCE?

10     A.   YES.

11     Q.   TELL US WHAT MR. POTRATZ SAID.

12     A.   MR. POTRATZ SAID THAT HE WAS THE OWNER AND THE MANAGING

13     MEMBER OF PRIMORDIAL PERFORMANCE.

14     Q.   AND WHO WAS IN CHARGE?

15     A.   HE SAID HE WAS IN CHARGE.

16     Q.   OKAY.  AND DID YOU TALK ABOUT MR. POTRATZ'S HISTORY IN

17     DIETARY SUPPLEMENTS?

18     A.   YES, WE DID.

19     Q.   AND WHAT DID MR. POTRATZ SAY?

20     A.   HE SAID HE'D BEEN DISTRIBUTING DIETARY SUPPLEMENTS SINCE

21     HE WAS APPROXIMATELY 16 YEARS OLD IN HIGH SCHOOL.  HE SAID THAT

22     HE WAS A WRESTLER AND A WEIGHT LIFTER IN HIGH SCHOOL, AND THAT

23     THE SCIENCE PART OF IT REALLY INTERESTED HIM.

24     Q.   DID YOU TALK ABOUT HIS LEVEL OF FORMAL EDUCATION IN

25     DIETARY SUPPLEMENTS?

1     A.    YEAH.   THAT WAS ONE OF THE EARLIER QUESTIONS WE ASKED,

2     WHAT TYPE OF FORMAL EDUCATION DO YOU HAVE THAT WOULD ALLOW YOU

3     TO DO THIS AND SELL THESE TO CONSUMERS?

4     Q.    AND WHAT DID HE SAY?

5     A.    HE SAID HE HAD NO FORMAL EDUCATION REGARDING DIETARY

6     SUPPLEMENTS, THEIR MANUFACTURE, THEIR MANUFACTURING, THEIR

7     FORMULATION.

8     Q.    SO DID YOU THEN TALK ABOUT IDENTIFIERS OF THE COMPANY?

9     A.    YES.

10    Q.    AND IN GENERAL, WHAT DID YOU SAY AND WHAT WAS HIS ANSWER?

11    A.    WE ASKED HIM ABOUT AN E-MAIL ADDRESS ACCOUNT AND HE

12    IDENTIFIED AN E-MAIL ADDRESS ACCOUNT THAT HE HAD.  WE ASKED HIM

13    WHERE HIS OFFICE WAS IN THE LOCATION AND HE TOLD US THAT.

14    Q.    AND WHAT ABOUT THE BUSINESS STATUS OF PRIMORDIAL?  IN

15    OTHER WORDS, WAS IT INCORPORATED?  WAS IT AN LLC?  DID YOU

16    DISCUSS THAT?

17    A.    YES, WE DID.

18    Q.    AND WHAT DID HE SAY?

19    A.    HE SAID IT WAS AN LLC AND THAT HE WAS THE ONLY PERSON

20    LISTED ON THE LLC.

21    Q.    DID HE MENTION SOME OTHER INDIVIDUALS WHO WERE INVOLVED IN

22    THE COMPANY.

23    A.    HE DID, BUT SAID THAT THEY WERE ONLY INVOLVED IN AN

24    OPERATING AGREEMENT THAT HE HAD WITH THEM.

25    Q.    AND SO MOVING ON, DID YOU DISCUSS WITH MR. POTRATZ WHAT

1    THE PURPOSE OF THE BUSINESS OF PRIMORDIAL PERFORMANCE WAS?

2    A.   YES, WE DID.

3    Q.   AND WHAT DID HE SAY?

4    A.   HE SAID THE PURPOSE WAS TO SELL STEROIDS FOR THE PURPOSE

5    OF MALE HEALTH.

6    Q.   AND DID YOU DISCUSS THAT FURTHER?

7    A.   A LITTLE BIT, YES.

8    Q.   TELL US WHAT HE SAID.

9    A.   THAT HE CLARIFIED THE PRODUCTS WERE CREATED TO ASSIST

10   MALES IN THEIR PHYSICAL ABILITIES AND THE WAY THEY FELT AND

11   LOOKED.

12   Q.   NOW, DID HE TALK ABOUT HOW THE PRODUCTS WERE DISTRIBUTED?

13   A.   HE DID.

14   Q.   AND WHAT DID HE SAY?

15   A.   HE SAID PRIMARILY THROUGH THEIR ONLINE WEBSITE,

16   PRIMORDIALPERFORMANCE.COM.

17   Q.   DID THE TOPIC OF BODYBUILDING.COM COME UP?

18   A.   IT DID.

19   Q.   AND TELL US THE CONVERSATION REGARDING THAT.

20   A.   HE SAID HE HAD, IN THE PAST, DISTRIBUTED PRODUCT THROUGH

21   BODYBUILDING.COM, THAT RETAILER THAT WE TALKED ABOUT LAST

22   FRIDAY, BUT THAT BODYBUILDING.COM NO LONGER DID THAT BECAUSE

23   BODYBUILDING.COM GOT OUT OF THE BUSINESS OF DISTRIBUTING

24   HORMONAL OR STEROID PRODUCTS.

25   Q.   AND DID YOU DISCUSS AN INDIVIDUAL NAMED MATT PORTER?

1    A.    WE DID.

2    Q.    AND TELL US WHAT WAS SAID ABOUT MATT PORTER.

3    A.    HE SAID HE WAS -- MR. POTRATZ SAID HE WAS A BODY BUILDER,

4    AN EMPLOYEE OF PRIMORDIAL, AND THAT HE MAINTAINED FIVE MESSAGE

5    BOARDS, WAS THE MODERATOR ON THE MESSAGE BOARDS THAT TALKED

6    ABOUT PRIMORDIAL PRODUCTS.

7    Q.    AND DID YOU DISCUSS THE ANDRO SERIES OF PRODUCTS?

8    A.    YES, WE DID.

9    Q.    AND TELL US WHAT MR. POTRATZ SAID ABOUT THAT.

10   A.    HE SAID HE WAS THE SOLE FORMULATOR OF THOSE PRODUCTS AND

11   SAID BASICALLY THEY WERE SELLING THEM FOR THE PURPOSE OF

12   SELLING A STEROID THAT WAS DSHEA COMPLIANT, OR THE DIETARY

13   SUPPLEMENT HEALTH EDUCATION ACT COMPLIANT.  IT WAS AN ACT

14   PASSED IN 1994, AND IT BASICALLY LISTED THE RULES AND THE

15   REGULATIONS IN ORDER TO SELL SOMETHING THAT'S PURPORTED TO BE A

16   DIETARY SUPPLEMENT.

17   Q.    OKAY.  AND DID YOU DISCUSS HOW MR. POTRATZ WAS ABLE TO

18   FORMULATE PRODUCTS?

19   A.    YES.

20   Q.    AND TELL US WHAT HE SAID ABOUT THAT.

21   A.    HE TOLD US THAT HE GETS HIS RAW INGREDIENTS FROM CHINA,

22   AND ONCE THEY'RE IMPORTED INTO THE U.S., PRIMORDIAL WILL MIX

23   THOSE RAW INGREDIENTS INTO A FINISHED PRODUCT.

24   Q.    AND DID HE SAY WHERE THAT HAPPENED?

25   A.    I DON'T RECALL IF HE SAID THAT.

1    Q.   OKAY.  AT THAT POINT, DID HE EVER SAY THAT PRIMORDIAL HAD

2    ANOTHER LOCATION?

3    A.   NOT THAT I'M AWARE OF, NO.

4    Q.   OKAY.  SO YOU TALKED ABOUT A COMPANY CALLED CHROMOADEX?

5    A.   HE DID.

6    Q.   WHAT WAS SAID ABOUT THAT?

7    A.   HE SAID THAT CHROMOADEX DID SOME TESTING FOR THEM SO THAT

8    THEY WOULD TEST THE FINAL PRODUCT.  YEAH.

9    Q.   AND WHAT ABOUT THE, THE NAME PACIFIC ENCAPSULATION?  DID

10   THAT COME UP?

11   A.   IT DID.

12   Q.   AND WHAT WAS THAT -- WHAT WAS SAID ABOUT THAT?

13   A.   THAT PACIFIC ENCAPSULATION WAS USED TO ENCAPSULATE THE

14   PRODUCT, SO THAT HE WOULD SEND THE RAW MATERIAL, ALONG WITH

15   INSTRUCTIONS OF HOW MUCH TO PUT INTO EACH CAPSULE, AND

16   PACIFIC ENCAPSULATION WOULD PERFORM THAT WORK FOR HIM.

17   Q.   OKAY.  I'M SORRY.  I WANT TO GO BACK A LITTLE BIT TO

18   CHROMOADEX.

19   A.   UM-HUM.

20   Q.   AND DID YOU DISCUSS CHROMOADEX WITH REGARDS TO AN

21   INDIVIDUAL CALLED DANIEL FABRICANT?

22   A.   HE DID.

23   Q.   FIRST, WHO IS DANIEL FABRICANT, AS YOU UNDERSTOOD IT BACK

24   THEN?

25   A.   HE WAS THE FORMER FDA DIRECTOR OF THE DIVISION OF DIETARY

1      SUPPLEMENTS.

2      Q.   OKAY.  AND WHAT WAS SAID REGARDING CHROMOADEX AND

3      DANIEL FABRICANT?

4      A.   MR. POTRATZ SAID THAT HE WAS AWARE THAT DANIEL FABRICANT

5      HAD A RELATIONSHIP WITH CHROMOADEX, SO THAT BY USING

6      CHROMOADEX, PRIMORDIAL WOULD BE LOOKED AT WITH LESS SCRUTINY

7      BECAUSE THEY WERE USING A COMPANY THAT WAS ASSOCIATED WITH THE

8      FDA'S DIRECTOR OF DIETARY SUPPLEMENTS.

9      Q.   IS THAT LESS SCRUTINY BY THE FDA?

10     A.   CORRECT.

11     Q.   SO DID YOU DISCUSS HOW OFTEN PRIMORDIAL RECEIVED RAW

12     PRODUCT FROM CHINA?

13     A.   I DID.

14     Q.   OKAY.  AND WHAT WAS SAID?

15     A.   MR. POTRATZ RESPONDED AND SAID THAT IT WAS ABOUT ONCE PER

16     MONTH.

17     Q.   SO DID YOU DISCUSS WHETHER THE FDA HAD EVER SEARCHED

18     PRIMORDIAL PERFORMANCE?

19     A.   SEARCH OR INSPECTED, YES, WE DID.

20     Q.   I'M SORRY.  YOU WERE SEARCHING IT AT THAT TIME.

21     A.   CORRECT.

22     Q.   BUT I MEAN A PRIOR INSPECTION, A REGULATORY TYPE

23     INSPECTION?

24     A.   YEAH, WE ASKED HIM THAT QUESTION.

25     Q.   WHAT WAS SAID?

1    A.   HE SAID THEY HAD NEVER BEEN INSPECTED BY THE FDA.

2    Q.   WHAT ABOUT PACIFIC ENCAPSULATION?

3    A.   HE DID SAY THAT PACIFIC ENCAPSULATION HAD BEEN INSPECTED

4    BY THE FDA.

5    Q.   AND DID HE ELABORATE ON WHAT HAPPENED DURING THAT

6    INSPECTION --

7    A.   THE --

8    Q.   -- OF PACIFIC ENCAPSULATION?

9    A.   YEAH.  HE BASICALLY SAID THAT THE INDIVIDUALS ASSOCIATED

10   WITH PACIFIC ENCAPSULATION TOLD HIM THAT THERE WERE NO FDA

11   ISSUES WITH ANY OF THE PRIMORDIAL PRODUCTS WHEN THEY INSPECTED

12   THERE.

13   Q.   AND DID YOU TALK ABOUT THE LABELS THAT WERE ON PRIMORDIAL

14   PRODUCTS?

15   A.   WE DID.

16   Q.   OKAY.  WAS THAT IMPORTANT TO YOU AS AN FDA AGENT AT THE

17   TIME?

18   A.   YES.

19   Q.   WHY WOULD THAT BE IMPORTANT?

20   A.   LABEL ACCURACY, THE CLAIMS BEING MADE ON THE LABEL --

21   POTENTIAL CLAIMS ON THE LABEL COULD MAKE THAT PRODUCT A DRUG

22   VERSUS A DIETARY SUPPLEMENT.  SO WE WERE INTERESTED IN WHO WAS

23   THE ONE PUTTING THOSE WORDS ON THE PRIMORDIAL PERFORMANCE

24   LABELS.

25   Q.   SO IS IT FAIR TO SAY THAT EVEN IF THE INGREDIENT ITSELF IS

```
 1    NOT A DRUG, THE CLAIMS MADE ON THE LABEL COULD MAKE IT INTO A

 2    DRUG FOR THE PURPOSES OF THE FOOD, DRUG, AND COSMETIC ACT?

 3    A.   THAT'S CORRECT.

 4    Q.   AND THAT'S SOMETHING YOU WERE INTERESTED IN; CORRECT?

 5    A.   CORRECT, WE WERE.

 6    Q.   SO WHAT DID MR. POTRATZ SAY ABOUT THE LABELS?

 7    A.   MR. POTRATZ SAID THAT HE CREATED THAT LABELS, THAT

 8    EVERYTHING THAT WENT ON THEM CAME FROM HIM AND THAT THEY WERE

 9    ALL HIS WORK.

10    Q.   DID HE DISCUSS WHETHER HE USED ANY OUTSIDE SOURCES FOR

11    EITHER PRODUCT NAMES OR THE CHEMICAL STRUCTURES?

12    A.   WE ASKED HIM THAT AND HE SAID HE DID NOT.

13    Q.   OKAY.  AND DID YOU DISCUSS WHETHER MR. POTRATZ REVIEWED

14    FDA PUBLISHED CONTENT?

15    A.   YES.

16    Q.   WHAT DID HE SAY?

17    A.   HE SAID THAT HE DID.

18    Q.   AND SO FAIR TO SAY HE STATED THAT THE RAW MATERIALS WERE

19    MIXED AT PRIMORDIAL AND THEN SENT TO PACIFIC ENCAPSULATING?

20    A.   HE DID SAY THAT, CORRECT.

21    Q.   AND THEN WHAT HAPPENED AFTER THAT?  WHAT DID HE SAY

22    HAPPENED WITH THE ENCAPSULATED PRODUCT?

23    A.   SO THE ENCAPSULATED PRODUCT WOULD BE SENT BACK TO

24    PRIMORDIAL, IT WOULD THEN BE PLACED IN THE BOTTLES, AND THEN

25    THE LABELS WOULD THEN BE AFFIXED TO THE BOTTLES THAT HE
```

1    CREATED.

2    Q.   OKAY.  AND WHERE DID THE SHIPPING HAPPEN?

3    A.   WHERE DID IT HAPPEN?

4    Q.   WELL, WAS IT SHIPPED -- DID MR. POTRATZ SAY THAT IT WAS

5    SHIPPED FROM PRIMORDIAL OR DID IT GO TO A WAREHOUSE OR A

6    SHIPPING CENTER?  WHAT DID HE SAY?

7    A.   LET ME JUST REFRESH MY RECOLLECTION HERE.

8    Q.   OKAY.

9    A.   HE SAID THAT THE PRODUCTS ARE FINALIZED AT PRIMORDIAL'S

10   HEADQUARTERS AND SHIPPED TO CUSTOMERS FROM THERE, FROM

11   PRIMORDIAL.

12   Q.   OKAY.  AND DID YOU DISCUSS WHETHER EMPLOYEES AT PRIMORDIAL

13   HAD CONCERNS OVER THE LEGALITY OF PRIMORDIAL'S PRODUCTS?

14   A.   WE DID.

15   Q.   AND WHAT DID MR. POTRATZ SAY ABOUT THAT?

16   A.   HE SAID THAT HE HAS HAD DISCUSSIONS WITH SOME OF HIS

17   EMPLOYEES REGARDING FDA LAW AND THAT SOME EMPLOYEES DID HAVE

18   CONCERNS OVER WHETHER OR NOT HIS PRODUCTS WERE LEGAL.

19        HE STATED THOUGH THAT NO ONE HAD EVER LEFT THE COMPANY

20   BECAUSE OF THOSE CONCERNS.

21   Q.   DID YOU DISCUSS THE ANDRO SERIES OF PRODUCTS -- I'M

22   SORRY -- THE INGREDIENTS IN THE ANDRO SERIES OF PRODUCTS?

23   A.   YES.

24   Q.   AND WHAT DID HE SAY ABOUT THAT?

25   A.   HE SAID THERE WAS AN ABUNDANCE OF PUBLISHED STUDIES ON THE

1    COMPOUNDS AND THAT THEY WERE CONTAINED IN THE FOOD SUPPLY AND

2    THUS MET THE CRITERIA OF A DIETARY SUPPLEMENT.

3    Q.   DID YOU FOLLOW UP ON THAT ISSUE?

4    A.   YES.

5    Q.   WHAT DID YOU SAY?

6    A.   WELL, WE ASKED HIM WHETHER OR NOT HE HAD EVER CONSULTED

7    WITH ANY ATTORNEYS OR ANY LEGAL SOURCE TO MAKE SURE THAT THAT

8    WAS THE CASE, THAT HIS PRODUCTS WERE FOLLOWING FDA LAW, AND HE

9    SAID HE HAD NOT.

10   Q.   DID HE SAY THAT, WHETHER HE CONSULTED WITH ANYBODY?

11   A.   YEAH.  HE SAID HE HAD NOT.  HE SAID HE ONLY READ FDA

12   PUBLISHED MATERIAL AND -- YOU KNOW, PUBLISHED PRODUCT MATERIAL

13   IN ORDER TO DETERMINE THE LEGALITY OF HIS PRODUCTS, SO ONLY HIS

14   OWN RESEARCH.

15   Q.   DID HE CONSULT WITH CHROMOADEX AND HIS CHINESE SUPPLIERS,

16   IF YOU RECALL?

17   A.   HE DID SAY THAT AS WELL, CHROMOADEX AND THE CHINESE

18   SUPPLIERS, WHETHER OR NOT HIS PRODUCTS WERE LEGAL.

19   Q.   DID YOU DISCUSS THE ISSUE OF COMPLAINTS FROM CUSTOMERS?

20   A.   WE DID.

21   Q.   AND TELL US WHAT YOU SAID AND WHAT HIS RESPONSES WERE.

22   A.   HE SAID HE NEVER HAD ANY SERIOUS COMPLAINTS FROM

23   CUSTOMERS.  HE SAID THERE WERE SOME MINOR COMPLAINTS FILED

24   ABOUT NAUSEOUSNESS, ABOUT SOME ACNE FROM USING THE PRODUCTS,

25   AND HE SAID HE HAD THOSE RECORDS ON HAND, EITHER IN E-MAILS OR

```
 1      IN HARD COPY, WITH THE COMPANY.  BUT HE SAID THERE WAS NEVER

 2      ANYTHING SERIOUS FILED.

 3      Q.   UM-HUM.  AND DID YOU DISCUSS ANYTHING ABOUT A MONEY BACK

 4      GUARANTEE FROM PRIMORDIAL, IF YOU RECALL?

 5      A.   YES.

 6      Q.   AND WHAT WAS SAID AND WHAT WAS HIS RESPONSE?

 7      A.   HE SAID THAT PRIMORDIAL WOULD ALLOW A CUSTOMER TO RETURN

 8      THE PRODUCT IF THEY HAD AN ISSUE OR A SIDE EFFECT AND THERE WAS

 9      A MONEY BACK GUARANTEE.

10      Q.   OKAY.  DID THAT MONEY BACK GUARANTEE CONTINUE?

11      A.   I DON'T KNOW.

12      Q.   OKAY.  THEN I BELIEVE YOU MENTIONED YESTERDAY ABOUT

13      SUPERDROL.  DID YOU DISCUSS SUPERDROL?

14      A.   WE DID.

15      Q.   AND WHAT WAS SUPERDROL AGAIN?

16      A.   SO SUPERDROL WAS THE PRODUCT THAT I HAD ORIGINALLY

17      RECEIVED THE REFERRAL FROM THE UNITED STATES ANTI-DOPING AGENCY

18      ON.  IT WAS A PRIMORDIAL E-MAIL SAYING THAT THEY HAD A LIMITED

19      SUPPLY OF SUPERDROL TO DISTRIBUTE.

20          I HAD WORKED A PREVIOUS CASE ON SUPERDROL, SO I KNEW ALL

21      ABOUT IT.  I KNEW THAT IT WAS A VERY POWERFUL METHYLATED

22      ANABOLIC STEROID.

23               MR. ARCHER:  OBJECTION.  RELEVANCE, NONRESPONSIVE.

24               MR. PARRELLA:  WELL, I ASKED WHAT IT WAS AND HE --

25               THE COURT:  OVERRULED.
```

1          GO AHEAD.  YOU MAY ANSWER.

2              THE WITNESS:  IT WAS A VERY POWERFUL METHYLATED

3    ANABOLIC STEROID THAT I HAD SEEN KIDS, HIGH SCHOOL AND COLLEGE

4    KIDS, HAVE SEVERE LIVER INJURIES FROM USING.

5          SO I ASKED HIM WHETHER OR NOT HE HAD SOLD SUPERDROL.

6    BY MR. PARRELLA:

7    Q.   AND WHAT WAS HIS RESPONSE?

8    A.   HIS RESPONSE WAS THAT HE HAD, THAT HE SOLD SUPERDROL IN

9    2010 FOR ABOUT THREE MONTHS.

10   Q.   AND DID HE ESTIMATE THE AMOUNT OF BOTTLES?

11   A.   HE SAID IT WAS ABOUT 500 BOTTLES THAT PRIMORDIAL SOLD.

12   Q.   AND WHAT DID HE -- WELL, WITHDRAWN.

13        DID HE SAY WHY HE STOPPED SELLING IT?

14   A.   HE SAID AT THE TIME HE WAS SELLING IT, HE WAS UNDER THE

15   IMPRESSION THAT IT WAS LEGAL.  BUT HIS -- IN HIS WORDS, AT SOME

16   POINT AFTER THAT, HE WAS INFORMED BY SOMEONE THAT HE SHOULD

17   STOP SELLING IT.

18   Q.   DID YOU DISCUSS 1-T TREN?

19   A.   WE DID.

20   Q.   AND, AGAIN, YOU MENTIONED 1-T TREN YESTERDAY, BUT WHAT IS

21   1-T TREN?

22   A.   1-T TREN, IT'S IN THE MESSAGE BOARD POST THAT PRIMORDIAL

23   HAD A 1-T TREN PRODUCT, WHICH THE ACTIVE COMPOUND I KNEW TO BE,

24   AGAIN, ANOTHER ANABOLIC STEROID THAT I HAD DONE A PREVIOUS

25   INVESTIGATION IN AND THAT THE FDA HAD PUBLICLY ANNOUNCED THAT

1    THIS WAS ILLEGAL TO DISTRIBUTE.

2    Q.   OKAY.  AND TELL US ABOUT THE CONVERSATION WITH 1-T TREN.

3    A.   THAT PRIMORDIAL HAD SOLD 1-T TREN IN THE PAST.

4         I ASKED HIM ABOUT ITS COMPLIANCE WITH THE DIETARY

5    SUPPLEMENT HEALTH EDUCATION ACT AND WHETHER OR NOT 1-T TREN WAS

6    COMPLIANT IN HIS VIEW AND EXPERIENCE.

7         HE SAID HE HAD SOLD THAT PRODUCT IN 2009 AND THAT HIS, HIS

8    EDUCATION ON DSHEA WAS A LOT LESS THEN THAN IT WAS WHEN WE WERE

9    TALKING TO HIM THEN.

10        I ASKED HIM HOW A TOPICAL CREAM, WHICH HE HAD 1-T TREN

11   AVAILABLE IN, COULD MEET THE DEFINITION OF A DIETARY

12   SUPPLEMENT, BECAUSE I WAS AWARE THAT A TOPICAL CREAM DOES NOT

13   MEET THE DEFINITION OF A DIETARY SUPPLEMENT.

14        HE SAID THAT THERE WAS SOME CONTROVERSY OVER WHETHER

15   ABSORPTION OF A PRODUCT COULD BE CONSIDERED DIGESTION OF A

16   PRODUCT.

17   Q.   AND SO WHAT DID HE STATE THAT THEY, PRIMORDIAL, DID WITH

18   TOPICAL SUPPLEMENTS?

19   A.   HE SAID AFTER THAT, THEY CHANGED THE CATEGORIZATION OF ALL

20   TOPICAL SUBSTANCES THAT THEY SOLD TO A COSMETIC VERSUS A

21   DIETARY SUPPLEMENT.

22   Q.   THANK YOU.

23        NOW, DID YOU CONFRONT MR. POTRATZ WITH THE KNOWLEDGE YOU

24   HAD ABOUT PRIMORDIAL'S SALE OF 1-T TREN?

25   A.   COULD YOU CLARIFY THAT, THAT QUESTION?

1    Q.   SO IF YOU NEED TO REFRESH YOUR RECOLLECTION, I'LL DIRECT

2    YOU TO PAGE 4 OF YOUR REPORT, OR OF THE REPORT AT THE TOP.

3         BUT THE QUESTION IS, DID YOU DISCUSS THE PREVIOUS FDA

4    ACTION AGAINST THE SALE OF 1-T TREN?

5    A.   YES, WE DID.

6    Q.   TELL US WHAT WAS SAID ABOUT THAT.

7    A.   HE CONFIRMED THAT HE -- THAT HE ACKNOWLEDGED THAT THERE

8    WAS PREVIOUS FDA ACTION AGAINST THE SALE OF TREN, WHICH WAS THE

9    COMPOUND IN THE 1-T TREN PRODUCT, AND THAT HE WAS MARKETING AND

10   SELLING THE 1-T TREN AFTER THAT FDA ACTION HAD ALREADY

11   OCCURRED.

12   Q.   OKAY.  SO MR. NOVITZKY, IN YOUR TIME AS AN FDA AGENT AND

13   NOW IN YOUR PRESENT JOB, ARE YOU AWARE OF WHAT THE TERM

14   "STRUCTURE AND FUNCTION" CLAIMS ARE?

15   A.   YEAH, I HAVE SOMEWHAT OF A RECOLLECTION.

16   Q.   SO WHAT, TO AN FDA AGENT, WHAT DOES STRUCTURE AND FUNCTION

17   CLAIMS OF A PRODUCT MEAN?

18        MR. ARCHER:  OBJECTION, YOUR HONOR.  CALLS FOR A

19   LEGAL CONCLUSION.

20        THE COURT:  WHAT'S YOUR RESPONSE?

21        MR. PARRELLA:  I'M NOT ASKING FOR A LEGAL DEFINITION.

22   I ASKED FOR HIS, AN FDA AGENT'S, UNDERSTANDING AND WHY HE WOULD

23   USE IT IN THE COURSE OF AN INVESTIGATION, IN THE COURSE OF AN

24   INTERVIEW.

25        MR. ARCHER:  THEN I WOULD ASK WHAT IT'S RELEVANT TO

1       AS IT APPEARS TO BE INTERPOSING FOR A LEGAL CONCLUSION.

2               THE COURT:  OVERRULED.

3           GO AHEAD.  YOU MAY ANSWER.

4       BY MR. PARRELLA:

5       Q.   SO --

6       A.   CAN YOU REPEAT THE QUESTION?

7       Q.   YEAH.  THE QUESTION IS, AS AN FDA AGENT AT THE TIME, WHAT

8       DID YOU UNDERSTAND STRUCTURE AND FUNCTION CLAIMS TO BE?

9       A.   YEAH.  I MEAN, IT'S BEEN TWO AND A HALF YEARS SINCE I'VE

10      BEEN AN FDA AGENT, SO I, I PROBABLY COULDN'T GIVE YOU A GOOD

11      ANSWER ON THAT RIGHT NOW.  I DON'T RECALL.

12      Q.   OKAY.  SO DID YOU DISCUSS THAT, THOUGH, THE -- IN TERMS OF

13      STRUCTURE AND FUNCTION CLAIMS WITH REGARDS TO PRIMORDIAL

14      PRODUCTS?

15      A.   WE DID --

16      Q.   AND WHAT --

17      A.   -- TO GET MR. POTRATZ'S VIEW OF WHAT, IF ANY,

18      STRUCTURE/FUNCTION CLAIMS WERE BEING MADE ON THE PRODUCT.  WE

19      DID ASK HIM THAT, CORRECT.

20      Q.   OKAY.  AND WHAT DID HE SAY?

21      A.   HE BASICALLY SAID THAT THE ONLY CLAIMS WERE THAT THE

22      STEROIDS BUILT STRONG MUSCLES AND BONES, THE SAME AS CALCIUM

23      WOULD BUILD STRONG MUSCLES AND BONES.

24      Q.   AND DID YOU ASK WHETHER THERE WAS ANY REVIEW OF

25      PRIMORDIAL'S LABELING OR MARKETING CLAIMS?

1    A.   WE DID.  WE ASKED, HEY, THE THINGS THAT YOU PUT ON THE

2    LABEL, DID ANY THIRD PARTY, ANY THIRD PARTY REVIEW IT TO MAKE

3    SURE THAT THOSE CLAIMS WERE FDA COMPLIANT?

4         AND HE SAID HE HADN'T HAD ANYONE ELSE REVIEW THOSE CLAIMS

5    ON THE PRODUCT.

6    Q.   OKAY.  SO DID YOU TALK ABOUT WHETHER PRIMORDIAL WAS

7    REGISTERED WITH THE FDA?

8    A.   YEAH.  HE SAID THAT THEY WERE REGISTERED WITH THE FDA AS A

9    RELABELER OR A REPACKAGER.

10   Q.   AND DID YOU DISCUSS THAT WITH HIM?

11   A.   WE DID.

12   Q.   AND WHAT DID HE SAY?

13   A.   HE TOLD US THAT PRIMORDIAL DOES MORE THAN JUST RELABELING

14   AND REPACKAGING DESPITE ONLY BEING LICENSED BY THE FDA TO DO

15   THAT, BECAUSE HE SAID THAT THEY INDEED DO MIX INGREDIENTS AT

16   THE FACILITY.

17   Q.   OKAY.  DID YOU TALK ABOUT WHETHER PRIMORDIAL WAS PLANNING

18   ON REMOVING SOME CLAIMS MADE FOR SOME ITEMS?

19        SO REFRESH YOUR RECOLLECTION, THEN --

20   A.   YEAH, I'M DOING THAT RIGHT NOW.  THANK YOU.

21        WE DID DISCUSS THAT.

22   Q.   AND WHAT WAS SAID?

23   A.   HE SAID DUE TO THE RECENT EMPLOYEE CONCERNS ABOUT SOME OF

24   THE CLAIMS ON THE PRODUCT, AS WELL AS CUSTOMER COMMENTS ON

25   MESSAGE BOARDS THAT THEY WERE LOOKING AT, THEY WERE PLANNING ON

1     REMOVING SOME OF THE CLAIMS THAT THEY CURRENTLY HAD ON THE

2     PRODUCTS.

3     Q.   DID YOU DISCUSS THE ISSUE OF TESTING OF PRODUCTS?

4     A.   YES.

5     Q.   AND TELL US WHAT WAS SAID ABOUT THAT.

6     A.   THE PHRASE, IN QUOTES, THAT HE GAVE TO US REGARDING

7     TESTING WAS "HAVEN'T TESTED AS MUCH AS WE SHOULD HAVE."

8     Q.   AND DID HE GO ON TO SAY WHAT RECENTLY HE HAD DONE WITH

9     REGARDS TO TESTING?

10    A.   SO THEY DON'T TEST EVERY BATCH OF FINISHED CAPSULES FROM

11    PACIFIC ENCAPSULATION BECAUSE OF COSTS, COSTS WERE TOO HIGH.

12         BUT HE DID SAY THAT THEY RECENTLY SENT SOME OF THE

13    PRODUCTS TO PATRICK ARNOLD WHO, HE SAID, RAN THEM THROUGH HIS

14    MACHINE AND THAT THIS INDIVIDUAL FOUND NO ILLEGAL STEROIDS IN

15    THE PRODUCTS.

16    Q.   SO DO YOU KNOW WHO PATRICK ARNOLD WAS?

17    A.   I DO.  I KNOW HIM WELL.

18    Q.   AND, IN FACT, WERE YOU THE CASE AGENT ON AN INVESTIGATION

19    INTO MR. ARNOLD?

20    A.   I WAS.

21    Q.   AND WAS HE PROSECUTED?

22    A.   HE WAS.

23    Q.   WHAT WAS HE PROSECUTED FOR?

24    A.   HE WAS PROSECUTED FOR MANUFACTURING AND DISTRIBUTING

25    UNAPPROVED DRUGS UNDER THE FDA LAW.

1      Q.   AND WHERE WAS HE LOCATED?

2      A.   HE WAS LOCATED IN ILLINOIS.

3      Q.   AND DID YOU BRING UP THE NAME PATRICK ARNOLD?

4      A.   I DID NOT.

5      Q.   MR. POTRATZ DID?

6      A.   THE DEFENDANT DID, CORRECT.

7      Q.   SO MOVING ON, DID YOU DISCUSS THE FINANCIAL STABILITY OF

8      PRIMORDIAL PERFORMANCE WITH MR. POTRATZ?

9      A.   YES.

10     Q.   AND TELL US ABOUT THAT.  WHAT WAS SAID?

11     A.   HE SAID IN 2011 THEY HAD SOME FINANCIAL DIFFICULTIES,

12     ALMOST HAD TO SHUT THE COMPANY DOWN BECAUSE MR. POTRATZ GOT

13     SICK AND HAD AN EMERGENCY APPENDECTOMY SURGERY.

14          HE SAID BECAUSE OF THESE FINANCIAL STRUGGLES, THEY HAD

15     BEEN UNABLE TO EMPLOY GOOD MANUFACTURING PRACTICES, WHICH ARE

16     THE STANDARDS IN ORDER TO -- FOR FOOD AND DIETARY SUPPLEMENT

17     PROCESSING TO MAKE SURE IT'S DONE CLEANLY AND ACCURATELY, SO TO

18     SAY.

19     Q.   SO DID YOU THEN DISCUSS ABOUT THE POTENTIAL SEARCH OF

20     COMPUTERS?

21     A.   YES.

22     Q.   AND WHAT DID YOU SAY?

23     A.   WE ASKED HIM IF WE WERE GOING TO FIND ANYTHING

24     INCRIMINATING, BECAUSE THE SEARCH WARRANT AUTHORIZED TO SEARCH

25     HIS COMPUTER DEVICES.  WE ASKED HIM IF WE WERE GOING TO FIND

1       ANYTHING INCRIMINATING ON THEM.

2           HIS RESPONSE WAS THE SALE OF 1-T TREN WAS PROBABLY, AND

3       THIS IS IN QUOTES, "THE WORST/DIRTIEST THING WE'VE DONE."

4       Q.   DID YOU TALK ABOUT WHETHER ANY -- WHETHER -- ABOUT CASE

5       STUDIES WITH REFERENCE TO THE ANDRO SERIES PRODUCTS?

6       A.   YES.

7       Q.   AND TELL US WHAT WAS SAID ABOUT THAT.

8       A.   HE SAID THAT THEY WERE CURRENTLY RUNNING 15 CASE STUDIES

9       ON USERS OF THE ANDRO SERIES PRODUCTS.

10      Q.   AND DID HE ELABORATE ON ANY OF THAT?

11      A.   HE SAID THAT THEY DID FULL BLOOD PROFILES ON THOSE

12      CUSTOMERS TAKING THE PRODUCTS, AND THAT HE WAS RUNNING THE

13      STUDIES HIMSELF.

14      Q.   AND DO YOU RECALL WHETHER ANY EVIDENCE OF THOSE STUDIES

15      WAS LOCATED IN THE COURSE OF THE SEARCH?

16      A.   I DON'T RECALL THAT.

17      Q.   OKAY.  SO DID YOU DISCUSS THE STATUS OF THE SUPPLIERS OF

18      THE RAW MATERIALS FROM CHINA WITH REGARDS TO THEIR STATUS WITH

19      THE FDA?

20      A.   YES.

21      Q.   AND WHAT DID HE SAY?

22      A.   HE SAID HE WASN'T SURE WHETHER OR NOT THEY WERE LICENSED

23      BY THE FDA.

24      Q.   OKAY.  AND DID THAT, IN SUM AND SUBSTANCE, CONCLUDE THE

25      INTERVIEW?

1    A.   YES.

2    Q.   ALL RIGHT.  SO WE'VE GONE THROUGH THIS INTERVIEW NOW IN

3    ABOUT, I BELIEVE A LITTLE OVER HALF AN HOUR.  IS IT FAIR TO SAY

4    YOU HAVEN'T RECOUNTED IT VERBATIM?

5    A.   CORRECT.

6    Q.   SO ABOUT WHAT TIME DID THE INTERVIEW STOP?

7    A.   APPROXIMATELY 11:14 A.M.

8    Q.   AND WHAT HAPPENED WITH MR. POTRATZ AT THAT POINT?

9    A.   HE WAS FREE TO GO.  I DON'T RECALL WHETHER OR NOT HE STUCK

10   AROUND DURING THE SEARCH WARRANT.

11       TYPICALLY IF AN OWNER OF A BUSINESS OR A RESIDENCE WANTS

12   TO STAY AROUND, THEY'LL USUALLY BE CONFINED TO ONE LOCATION AND

13   THEY CAN DO THAT.

14       IF THEY DON'T WANT TO DO THAT, THEN THEY USUALLY WILL

15   LEAVE AND COME BACK AT THE CONCLUSION OF THE SEARCH WHEN WE

16   TURN THE KEY OVER TO THEM OR MAKE SURE THAT THEY SEE THAT THE

17   FACILITY IS LOCKED UP.

18   Q.   BUT IN THIS CASE MR. POTRATZ WAS UNDER NO INSTRUCTIONS OR

19   PROHIBITIONS?

20   A.   CORRECT.

21       MR. PARRELLA:  OKAY.  YOUR HONOR, I HAVE NOTHING

22   FURTHER AT THIS POINT.

23       THE COURT:  ALL RIGHT.  IT'S 10:30.  SHOULD WE TAKE

24   OUR TEN MINUTE BREAK NOW?

25       MR. ARCHER:  THANK YOU, YOUR HONOR.

```
 1              THE COURT:  LET ME JUST SAY THAT MS. PHUNG IS

 2     ACTUALLY JUROR NUMBER 12.  SO WHEN WE COME BACK, JUST TO AVOID

 3     CONFUSION, I THINK YOU SHOULD TAKE MS. COPPENS'S SEAT, AND SO

 4     THEN MR. HU SHOULD TAKE THE NEXT SEAT, AND THEN

 5     MS. SADAT AKHAVI SHOULD TAKE THE LAST SEAT, JUST TO BE -- JUST

 6     TO BE CLEAR ON EXACTLY -- SO MS. PHUNG, YOU WILL BE

 7     DELIBERATING NOW.

 8          ALL RIGHT.  THANK YOU ALL.  PLEASE DON'T DO ANY RESEARCH

 9     OR DISCUSS THE CASE.

10          WE'LL TAKE A TEN MINUTE BREAK.  THANK YOU.

11              THE CLERK:  COURT'S IN RECESS.

12     (JURY OUT AT 10:30 A.M.)

13     (RECESS FROM 10:31 A.M. UNTIL 10:44 A.M.)

14     (JURY IN AT 10:44 A.M.)

15          THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

16          GO AHEAD, PLEASE, MR. ARCHER.

17              MR. ARCHER:  THANK YOU, YOUR HONOR.

18                          CROSS-EXAMINATION

19     BY MR. ARCHER

20     Q.   GOOD AFTERNOON, MR. NOVITZKY.  MY NAME IS GRAHAM ARCHER.

21     I'M WITH THE FEDERAL PUBLIC DEFENDER'S OFFICE AND I REPRESENT

22     MR. POTRATZ.

23     A.   GOOD MORNING.

24     Q.   DO YOU STILL HAVE THE COPY OF YOUR REPORT, OR A REPORT IN

25     FRONT OF YOU?
```

Case 5:15-cr-00236-LHK   Document 139   Filed 08/18/17   Page 33 of 60

1     A.   YES, I DO.

2     Q.   OKAY, GREAT.

3          SO THIS REPORT WAS FROM AN INTERVIEW THAT OCCURRED IN

4     2012; IS THAT CORRECT?

5     A.   CORRECT.

6     Q.   AND YOUR INVESTIGATION OF PRIMORDIAL PERFORMANCE STARTED

7     SOMETIME IN 2009?

8     A.   CORRECT.

9     Q.   OKAY.  AND THE ONLY PRODUCT THAT'S AT ISSUE IN THIS CASE

10    IS THE TURINABOL-LV PRODUCT; CORRECT?

11              MR. PARRELLA:  OBJECTION, YOUR HONOR.

12              MR. ARCHER:  OKAY.

13    Q.   TO YOUR --

14              THE COURT:  I'M SORRY.  WHAT'S THE OBJECTION?

15              MR. PARRELLA:  THE OBJECTION IS THAT IT CALLS FOR A

16    LEGAL CONCLUSION.  AND WE NEED TO BE HEARD --

17              THE COURT:  OKAY.  I DON'T WANT ANY SPEAKING

18    OBJECTIONS.

19         OVERRULED.

20         YOU MAY ANSWER THE QUESTION.

21              THE WITNESS:  I DON'T BELIEVE SO.

22    BY MR. ARCHER:

23    Q.   OKAY.  SO EVERY -- HAVE YOU HAD A CHANCE TO REVIEW THE

24    INDICTMENT IN THIS CASE?

25    A.   BRIEFLY.

1    Q.   OKAY.  YOU KNOW THAT MR. POTRATZ IS CHARGED WITH

2    DISTRIBUTION OF A CONTROLLED SUBSTANCE FOR THE TURINABOL-LV

3    PRODUCT?

4         MR. PARRELLA:  OBJECTION NOW, YOUR HONOR.

5         THE COURT:  AND WHAT'S THE BASIS OF THE OBJECTION?

6         MR. PARRELLA:  AGAIN, REVIEWING THE INDICTMENT IS

7    IMPROPER.

8         THE COURT:  IN THE PRELIMINARY JURY INSTRUCTIONS, I

9    SAID WHICH COUNTS WERE IN THE INDICTMENT FOR THE JURY TO

10   DECIDE.

11        OVERRULED.

12        GO AHEAD.  YOU MAY ANSWER, PLEASE.

13        THE WITNESS:  I'M SORRY.  COULD YOU ASK THAT AGAIN?

14   BY MR. ARCHER:

15   Q.   MY QUESTION IS, YOU'RE AWARE THAT, AS A RESULT OF THIS

16   INVESTIGATION, THAT HE WAS CHARGED WITH DISTRIBUTION OF A

17   CONTROLLED SUBSTANCE AS TO THE TURINABOL-LV PRODUCT ONLY;

18   CORRECT?

19   A.   I THINK SO.  I MEAN, I LOOKED OVER THE INDICTMENT FOR FIVE

20   MINUTES A COUPLE DAYS AGO.

21   Q.   OKAY.  SO TO YOUR KNOWLEDGE, THE PRODUCTS THAT HE WAS

22   PRODUCING -- EVERYTHING THAT YOU ORDERED UNDERCOVER AND

23   EVERYTHING THAT YOU SEIZED FROM THE PRIMORDIAL PERFORMANCE

24   FACILITY IN 2012, THOSE WERE ALL TESTED BY THE FDA

25   LABORATORIES; CORRECT?

1    A.   I COULDN'T SAY THAT IT WAS EVERYTHING.  I DON'T KNOW.

2    Q.   OKAY.  YOU WERE -- WHEN YOU MADE THOSE UNDERCOVER

3    PURCHASES, YOU WERE THE AGENT RESPONSIBLE FOR THEN HANDLING

4    THOSE SAMPLES; CORRECT?

5    A.   FOR THE PURCHASES I MADE, CORRECT.

6    Q.   OKAY.  AND ONE OF THE THINGS THAT YOU DID WHEN YOU

7    RECEIVED THOSE SAMPLES WAS THEN TO SEND THEM ON TO THE FDA

8    LABORATORIES; CORRECT?

9    A.   THE QUESTION -- YES, CORRECT.

10   Q.   THE UNDERCOVER PURCHASE ON MAY 12TH OF 2010, THE PURCHASE

11   OF THE TURINABOL-LV, YOU RECALL THAT?

12   A.   I DO.

13   Q.   OKAY.  AND YOU RECALL THAT WAS SENT OUT TO THE FDA LAB?

14   DO YOU?

15   A.   YES.

16   Q.   OKAY.  DO YOU RECALL THAT THERE WERE FOUR -- ON THAT DATE,

17   THERE WERE FOUR OTHER PRODUCTS THAT WERE ORDERED UNDERCOVER;

18   CORRECT?

19   A.   WAS THERE FOUR OTHERS OR WAS THERE A TOTAL OF FOUR?

20   Q.   I BELIEVE IT WAS A TOTAL OF FIVE.

21   A.   THAT SOUNDS RIGHT.

22   Q.   OKAY.  AND YOU SENT THOSE PRODUCTS TO THE FDA LAB AS WELL,

23   DID YOU NOT?

24   A.   SENT THAT ENTIRE UNDERCOVER ORDER, CORRECT.

25   Q.   OKAY.  AND TO YOUR UNDERSTANDING SITTING HERE TODAY, NO

1    CONTROLLED SUBSTANCES WERE FOUND IN ANY OF THE OTHER PRODUCTS;

2    IS THAT CORRECT?

3    A.    I DON'T KNOW AS I SIT HERE.  I HAVEN'T LOOKED AT THAT

4    REPORT IN A WHILE.

5    Q.    OKAY.  BUT YOU DON'T HAVE ANY -- SO YOU DON'T HAVE ANY

6    INDEPENDENT RECOLLECTION OF WHETHER THERE WERE OR WERE NOT

7    CONTROLLED SUBSTANCES FOUND IN ANY OF THE OTHER PRODUCTS?

8    A.    I DON'T.  REALLY THE ONLY RECOLLECTION I HAVE HERE, SINCE

9    IT'S BEEN SO MANY YEARS, IS THERE WAS CLEARLY A CONTROLLED

10   SUBSTANCE FOUND IN THE ONE.  WHETHER THE OTHER ONES HAD THEM OR

11   NOT, I DON'T RECALL.

12   Q.    OKAY.  THE INTERVIEW THAT YOU AND AGENT RICKHER DID OF

13   MR. POTRATZ IN 2012, THERE WAS NO MENTION OF THE TURINABOL-LV

14   PRODUCT; IS THAT CORRECT?

15   A.    I'D HAVE TO LOOK BACK THROUGH THE REPORT HERE.  SO NO

16   MENTION AT ALL?  YOUR QUESTION WAS NO MENTION AT ALL OF THE

17   TURINABOL-LV PRODUCT IN THAT INTERVIEW?

18   Q.    MY QUESTION IS, SITTING HERE TODAY, DO YOU HAVE ANY

19   RECOLLECTION OF ASKING MR. POTRATZ ABOUT THE TURINABOL-LV

20   PRODUCT IN YOUR INTERVIEW OF HIM?

21   A.    I DON'T.  BUT THAT INTERVIEW WAS FIVE YEARS AGO.  I'D HAVE

22   TO LOOK THROUGH THE REPORT HERE TO BE SURE.

23   Q.    OKAY.  SO IS IT SAFE TO SAY THAT THE ONLY -- THAT YOUR

24   TESTIMONY TODAY HAS BEEN ONLY IN RESPONSE TO WHAT YOU'VE BEEN

25   ABLE TO GLEAN FROM THE REPORT THAT YOU HAVE IN FRONT OF YOU?

1      A.   NO.

2      Q.   OKAY.  YOU'RE WELCOME TO REVIEW THAT REPORT AGAIN IF YOU

3   THINK IT WOULD HELP YOU REFRESH YOUR RECOLLECTION.

4      A.   I'M SURE IT WOULD.

5      Q.   OKAY.

6      A.   AND AGAIN, COULD YOU ASK THE SPECIFIC QUESTION AGAIN?

7      Q.   MY QUESTION SPECIFICALLY IS, DID YOU EVER, IN THAT 2012

8   INTERVIEW, ASK MR. POTRATZ ANYTHING ABOUT THE TURINABOL-LV

9   PRODUCT?

10     A.   WELL, I MEAN, I CAN ALREADY TELL YOU, THE QUESTION TO THAT

11   WOULD BE YES.  MAYBE NOT SPECIFICALLY BY NAME, BUT MANY OF THE

12   QUESTIONS I -- THAT I WOULD HAVE BEEN ASKING WOULD HAVE BEEN

13   RELEVANT TO THAT PRODUCT.

14          NOW, ARE YOU ASKING SPECIFICALLY ABOUT THAT NAME, THAT

15   PARTICULAR PRODUCT BY NAME?

16     Q.   SO AS OPPOSED TO YOUR OPINION THAT THE QUESTIONS WOULD BE

17   RELEVANT TO THE PRODUCT, I'M ASKING WHETHER YOU ASKED HIM ABOUT

18   THE PRODUCT.  IF YOU COULD ANSWER THAT QUESTION, PLEASE.

19     A.   SURE.

20          (PAUSE IN PROCEEDINGS.)

21          THE WITNESS:  THAT PRODUCT'S NAME, SPECIFIC NAME, WAS

22   NOT BROUGHT UP.

23   BY MR. ARCHER:

24     Q.   OKAY.  YOU DON'T HAVE ANY INDEPENDENT RECOLLECTION OF

25   ASKING HIM ABOUT THE TURINABOL-LV PRODUCT, DO YOU?

1    A.   THAT SPECIFIC PRODUCT, NO.

2    Q.   IN FACT, THAT PRODUCT HAD CEASED BEING SOLD BY THE

3    PRIMORDIAL PERFORMANCE COMPANY APPROXIMATELY TWO YEARS BEFORE

4    THE SEARCH WARRANT?

5    A.   I DON'T KNOW THAT TO BE THE CASE.

6    Q.   OKAY.  SO YOU DON'T KNOW THE DATES TO AND FROM WHICH THE

7    TURINABOL-LV PRODUCT WAS SOLD?

8    A.   NOT AS I SIT HERE, NO.

9    Q.   OKAY.  YOU MENTIONED PATRICK ARNOLD AND YOUR INVESTIGATION

10   OF PATRICK ARNOLD.  DO YOU RECALL THAT?

11   A.   I DO.

12   Q.   AND YOU'RE AWARE THAT THE PATRICK ARNOLD CASE AROSE OUT OF

13   AN INDICTMENT IN 2005; IS THAT CORRECT?

14   A.   YEAH.  IT WAS MY INVESTIGATION, YES.

15   Q.   OKAY.  SO MR. ARNOLD WASN'T CHARGED OR SUSPECTED OF ANY

16   CRIMINAL WRONGDOING AS IT RELATED TO MR. POTRATZ'S COMPANY; IS

17   THAT CORRECT?

18   A.   CORRECT.

19   Q.   OKAY.  AND HIS CASE HAD ACTUALLY COMPLETED PRIOR TO YOUR

20   AWARENESS OF ANY INTERACTION WITH MR. POTRATZ; IS THAT CORRECT?

21   A.   CORRECT.  HE HAD PLED GUILTY, HE HAD SERVED OUT HIS PRISON

22   SENTENCE.  HE HAD.

23   Q.   OKAY.  SINCE YOU BROUGHT THAT UP, I DO WANT TO TALK A

24   LITTLE BIT ABOUT THE BALCO INVESTIGATION.

25        YOU -- IN THAT INVESTIGATION -- I'D LIKE TO LIST SOME

1   CHARACTERISTICS OF THAT COMPANY AND SEE WHETHER YOU RECALL

2   THOSE TO BE PRESENT IN THAT CASE.

3        SO DO YOU RECALL THAT IN THE BALCO CASE THEY USED FALSE

4   NAMES ON MAILING LABELS?

5             MR. PARRELLA:  OBJECTION, YOUR HONOR.  HOW IS THIS

6   RELEVANT?

7             MR. ARCHER:  I'M HAPPY TO RESPOND, YOUR HONOR.  IT'S

8   RELEVANT IN THAT THESE ARE CHARACTERISTICS OF AN ILLEGAL

9   STEROID BUSINESS THAT THE AGENT HAD PREVIOUSLY INVESTIGATED.

10            THE COURT:  I'LL ALLOW IT.  GO AHEAD.

11       OVERRULED.

12       YOU MAY ANSWER.  GO AHEAD, PLEASE.

13  BY MR. ARCHER:

14  Q.   DO YOU RECALL FROM THE BALCO INVESTIGATION THAT THEY USED

15  FALSE NAMES ON MAILING LABELS?

16  A.   I DON'T ON THAT ONE.

17  Q.   YOU DON'T RECALL THAT.  DO YOU RECALL THAT THEY HAD

18  PROVIDED THEIR CUSTOMERS WITH COVER STORIES ABOUT WHAT TO DO IF

19  THEY WERE CONFRONTED ABOUT THEIR PRODUCTS?

20  A.   YES, DEFINITELY ON THAT ONE.

21  Q.   OKAY.  DO YOU RECALL THAT THEY KEPT THE PROCEEDS OF THEIR

22  ILLEGAL PRODUCTS SEPARATE FROM THE PROCEEDS OF THEIR LEGAL

23  PRODUCTS?

24  A.   I DO RECALL THAT.

25  Q.   AND THEY DID THAT BY KEEPING A SEPARATE SET OF BOOKS FOR

1    THOSE PRODUCTS VERSUS THEIR LEGITIMATE PRODUCTS; IS THAT

2    CORRECT?

3    A.   CORRECT.

4    Q.   OKAY.  AND THEY ALSO USED ABBREVIATIONS AND CODES TO

5    DESCRIBE THE ACTUAL PRODUCTS THAT THEY WERE SELLING; IS THAT

6    CORRECT?

7    A.   IN MANY INSTANCES, YES.

8    Q.   AND YOU DIDN'T FIND ANY INSTANCE OF SIMILAR CONDUCT IN

9    THIS CASE; IS THAT CORRECT?

10   A.   WELL, I MEAN, I WASN'T THE CASE AGENT FOR THE ENTIRETY OF

11   THE INVESTIGATION.  PRIMARILY, YOU KNOW, SEARCH WARRANT ON.  SO

12   DURING MY PERIOD OF TIME, YES.

13        BUT THAT WASN'T THE TOTALITY OF THE INVESTIGATION, SO I

14   CAN'T ANSWER THAT THOSE THINGS WEREN'T PRESENT.

15   Q.   SO MY QUESTION WASN'T DO YOU KNOW WITH ABSOLUTE CERTAINTY

16   THAT THOSE AREN'T PRESENT.  MY QUESTION IS, DID YOU FIND ANY OF

17   THOSE TELLTALE CHARACTERISTICS OF AN ILLEGAL STEROID BUSINESS

18   IN MR. POTRATZ'S COMPANY?

19   A.   CAN YOU -- WHAT TELLTALE CHARACTERISTICS?

20   Q.   FALSE NAMES ON MAILING LABELS, KEEPING ILLEGAL PROCEEDS

21   SEPARATE FROM LEGITIMATE SALES, PROVIDING COVER STORIES FOR

22   CUSTOMERS, KEEPING A SEPARATE SET OF BOOKS, AND USING

23   ABBREVIATIONS AND CODES TO DISGUISE THE PRODUCTS THAT THEY WERE

24   SELLING?

25   A.   I DON'T RECALL DURING MY TIME LOOKING INTO THIS TO HAVE

1       SEEN ANY OF THOSE THINGS.

2       Q.    OKAY.  THANK YOU.

3             AND IT'S YOUR UNDERSTANDING THAT DURING THE SEARCH OF

4       PRIMORDIAL PERFORMANCE IN 2012, THAT A WHOLE NUMBER OF RAW

5       INGREDIENTS WERE SEIZED; IS THAT CORRECT?

6       A.    CORRECT.

7       Q.    AND FINISHED PRODUCT WAS SEIZED AS WELL; IS THAT CORRECT?

8       A.    THAT'S MY UNDERSTANDING AND MY RECOLLECTION, CORRECT.

9       Q.    OKAY.  AND THE -- THE COMPANY ITSELF HAD A NUMBER OF

10      COMPUTER SERVERS.  DO YOU RECALL THAT?

11      A.    COMPUTER SERVERS YOU SAID?

12      Q.    CORRECT, COMPUTERS --

13      A.    I DON'T RECALL A NUMBER OF COMPUTER SERVERS.

14      Q.    OKAY.  DO YOU RECALL THAT THE COMPANY HAD COMPUTERS WITH

15      RECORDS ON THEM WHEN YOU SEARCHED THE PREMISES?

16      A.    YES, THAT WOULD BE ACCURATE.

17      Q.    OKAY.  AND IS IT YOUR UNDERSTANDING THAT ALL PASSWORDS AND

18      ALL SERVERS WERE TURNED OVER TO THE FDA WHEN THEY CAME ON

19      PREMISES THAT DAY?

20      A.    I DON'T RECALL THAT.

21      Q.    OKAY.  BUT YOU DON'T RECALL FINDING ANY INDICATION OR ANY

22      RECORD OF A SECRET SERVER OR SECRET AREA AT THE COMPANY WHEN

23      THE SEARCH WAS EXECUTED IN 2012?

24      A.    I MEAN, OTHER THAN ASKING A FEW QUESTIONS OF MR. POTRATZ

25      ABOUT, YOU KNOW, COMPUTERS AND HIM, YOU KNOW, NOTING THAT WE

1    COULD FIND SOME OF THIS INFORMATION ON E-MAILS, I DIDN'T HAVE

2    ANYTHING TO DO WITH ANY OF THE SEARCH OF THE COMPUTERS, SO I

3    COULDN'T -- I WOULDN'T BE A GOOD PERSON TO ANSWER THAT IN ANY

4    WAY.

5    Q.   UNDERSTOOD.  SO YOU MENTIONED THAT THERE WERE -- THAT YOU

6    HAD MET PEOPLE WHO HAD BEEN DAMAGED BY A PRODUCT CALLED

7    SUPERDROL.

8    A.   YES.

9    Q.   OKAY.  THAT WAS NOT THE PRODUCT -- THAT WAS NOT THE

10   SUPERDROL PRODUCT THAT MR. POTRATZ WAS SELLING; IS THAT

11   CORRECT?

12   A.   MY UNDERSTANDING WAS IT WAS THE INGREDIENT IN THE PRODUCT,

13   BUT NOT THE PRODUCT ITSELF.

14   Q.   OKAY.  BUT YOU DIDN'T -- THAT'S NOT BASED ON ANY ANALYSIS

15   OF THE -- OF MR. POTRATZ'S PRODUCT; IS THAT CORRECT?

16   A.   ANALYSIS OF THE PRODUCT, NO.

17        BASED ON HIS, ON MARKETING OF THE PRODUCT.

18   Q.   OKAY.  BUT YOU DON'T -- SO YOUR ASSUMPTION IS BASED ON

19   GUESSWORK BASED ON HIS MARKETING OF THE PRODUCT; IS THAT

20   CORRECT?

21   A.   I HAVE -- I DON'T REMEMBER IF IT WAS HIS UNDERCOVER

22   RECORDING OR SOMEBODY ELSE TALKING ABOUT SUPERDROL AND IT BEING

23   A SUPERDROL PRODUCT.  SO IT WOULD BE BASED ON THAT, TOO.

24        BUT, YEAH, THAT'S THE EXTENT OF IT, CORRECT.

25   Q.   BUT WHEN YOU'RE TALKING ABOUT PEOPLE BEING HARMED BY THE

1     PRODUCTS, YOU'RE NOT AWARE OF ANY HARM TO ANYONE DONE BY

2     ANYTHING SOLD BY MR. POTRATZ'S SUPERDROL PRODUCT; IS THAT

3     CORRECT?

4     A.   CORRECT.

5     Q.   OKAY.  I JUST WANT TO BE CLEAR FOR THE JURY, THE INCIDENTS

6     OF HARM ARE ABOUT SOMEONE ELSE'S PRODUCT ENTIRELY; IS THAT

7     CORRECT?

8     A.   SOMEONE ELSE'S SUPERDROL PRODUCT, CORRECT.

9     Q.   OKAY.  THE 1-T TREN PRODUCT THAT YOU TALKED ABOUT EARLIER,

10    THAT'S A PRODUCT THAT WAS ADDED TO THE DEA'S CONTROLLED

11    SUBSTANCES LIST IN -- WAS IT JANUARY 4TH OF 2010?

12    A.   CORRECT.

13    Q.   OKAY.  AND SO PRIOR TO THAT, IT WAS NOT A CONTROLLED

14    SUBSTANCE; IS THAT CORRECT?

15    A.   CORRECT.

16    Q.   OKAY.  AND IT IS THE FDA'S ROLE -- SORRY.

17         IT IS NOT THE FDA'S ROLE TO CRIMINALIZE ANY PARTICULAR

18    PRODUCT; IS THAT CORRECT?

19    A.   I DON'T THINK SO, NO.

20    Q.   OKAY.  SO WHEN YOU SAID THAT THE FDA HAD MADE THE TREN

21    PRODUCT ILLEGAL, THAT'S NOT A CORRECT STATEMENT, IS IT?

22    A.   NO.  IT -- WELL, IF I SAID THEY HAD MADE THE PRODUCT

23    ILLEGAL, NO.  THEY HAD CLARIFIED THAT IT WAS ILLEGAL.  THAT

24    WOULD HAVE BEEN THE CORRECT WAY TO CATEGORIZE IT.

25    Q.   SO IS IT -- WOULD IT BE ACCURATE TO SAY THAT THE FDA HAD

1    ANNOUNCED THAT THEY BELIEVED THE PRODUCT TO BE ILLEGAL?  IS

2    THAT AN ACCURATE WAY TO SAY IT?

3    A.    CORRECT.

4    Q.    OKAY.  BECAUSE THE FDA DOES NOT WRITE THE LAWS SURROUNDING

5    THESE SUBSTANCES; IS THAT CORRECT?

6    A.    WELL, I MEAN, IT DEPENDS WHAT LAWS YOU'RE TALKING ABOUT.

7    THE CONTROLLED SUBSTANCE ACT THAT SCHEDULES DRUGS, THE FDA DOES

8    NOT HAVE ANY INVOLVEMENT WITH THAT.

9          BUT AS IT RELATES TO THE FOOD, DRUG, AND COSMETIC ACT,

10   THEY WOULD COMMONLY PUT OUT NOTICES OF PRODUCTS THAT ARE ON THE

11   MARKET AND WHETHER THEY DO OR DON'T FOLLOW THAT LAW.

12   Q.    SO THESE -- BUT THE FDCA, THE LAW THAT WE'RE TALKING ABOUT

13   HERE, THAT LAW IS WRITTEN BY CONGRESS; IS THAT CORRECT?

14   A.    CORRECT.

15   Q.    OKAY.  SO THE NOTICES THAT YOU ARE TALKING ABOUT ARE THE

16   FDA'S INTERPRETATIONS OF THAT LAW, NOT THE ACTUAL LAW ITSELF;

17   IS THAT CORRECT?

18   A.    YEAH, IN THE CASE OF THE TREN PRODUCT, CORRECT.

19   Q.    OKAY.  SO IS IT CORRECT TO SAY THAT THERE IS NO EVIDENCE

20   THAT MR. POTRATZ'S COMPANY WAS SELLING THE 1-T TREN PRODUCT

21   AFTER IT HAD BEEN ADDED TO THE CONTROLLED SUBSTANCES LIST?

22   A.    YEAH.  MY RECOLLECTION IS I NEVER SAW ANY EVIDENCE OF

23   HIM -- OF THE SALES OF IT AFTER THE DEA SCHEDULED IT AS ILLEGAL

24   UNDER THE CONTROLLED SUBSTANCE ACT, CORRECT.

25   Q.    OKAY.  SO ALL -- SO TO YOUR KNOWLEDGE, ALL SALES OF THAT,

1    OR PRODUCTION OF THAT PRODUCT BY PRIMORDIAL PERFORMANCE CEASED

2    PRIOR, SOME POINT PRIOR TO IT BECOMING A CONTROLLED SUBSTANCE;

3    IS THAT CORRECT?

4    A.   I -- YOU KNOW, YEAH.  I DON'T RECALL SEEING ANYTHING THAT

5    THEY SOLD IT AFTER.  NOT THAT IT COULDN'T HAVE BEEN THERE, BUT

6    I DON'T RECALL MYSELF SEEING ANYTHING.

7    Q.   OKAY.  SO THEN I'M CORRECT THAT THERE IS NO EVIDENCE OF

8    THAT, OF SALES OCCURRING --

9    A.   I DON'T KNOW WHETHER THERE'S NO EVIDENCE, NO.  I CAN'T

10   ANSWER THAT.

11   Q.   DO YOU --

12   A.   WHETHER I'VE SEEN OR ARE AWARE OF ANY, I DON'T KNOW.

13   Q.   DO YOU HAVE ANY EVIDENCE OF THAT?

14   A.   I DON'T KNOW, NO, OR NEVER SAW ANY.

15   Q.   SO THE, THE TESTING OF THE TURINABOL-LV PRODUCT WAS

16   COMPLETED IN SEPTEMBER OF 2010 BY THE FDA LAB.  DO YOU RECALL

17   THAT?

18   A.   THAT SOUNDS RIGHT.

19   Q.   OKAY.  AND OTHER THAN THE UNDERCOVER PHONE CALLS, TO YOUR

20   KNOWLEDGE, THERE WAS NO COMMUNICATION BETWEEN THE FDA AND

21   MR. POTRATZ, OR ANYONE ELSE AT PRIMORDIAL PERFORMANCE, ABOUT

22   THE TURINABOL-LV PRODUCT UNTIL, UNTIL -- ACTUALLY, I'M NOT SURE

23   UNTIL WHEN.

24        BUT ARE YOU AWARE OF ANY COMMUNICATION BETWEEN THE FDA AND

25   MR. POTRATZ OR ANYBODY AT PRIMORDIAL PERFORMANCE ABOUT THE

1    TURINABOL-LV PRODUCT?

2    A.   OTHER THAN THE UNDERCOVER PURCHASES AND THE UNDERCOVER

3    PHONE CALL WHICH WE LISTENED TO, NO.

4    Q.   OKAY.

5    A.   I'M NOT AWARE.

6    Q.   SO THERE WAS NO -- TO YOUR KNOWLEDGE, THERE WAS NO WARNING

7    LETTER SENT TO PRIMORDIAL PERFORMANCE ABOUT THAT PRODUCT?

8    A.   I WASN'T AWARE OF THAT, NO.

9    Q.   OKAY.  AND DURING YOUR INVESTIGATION, YOU DIDN'T COME

10   ACROSS ANY WARNING LETTERS TO PRIMORDIAL PERFORMANCE ABOUT ANY

11   OF THEIR PRODUCTS FROM THE FDA; IS THAT CORRECT?

12   A.   I DON'T BELIEVE THAT I DID, THAT'S CORRECT.

13   Q.   OKAY.  AND THAT'S SOMETHING THAT YOU WOULD HAVE LOOKED FOR

14   IN YOUR INVESTIGATION, IS IT NOT?

15   A.   YES.

16   Q.   OKAY.  SO WHEN YOU WERE DISCUSSING WITH MR. POTRATZ IN

17   HIS, IN HIS STATEMENT THAT HE GAVE YOU IN 2012, THE MINOR

18   COMPLAINTS ASSOCIATED WITH, WITH ACNE AND OTHER SIDE EFFECTS,

19   THAT WASN'T SPECIFIC TO THE TURINABOL-LV PRODUCT, WAS IT?

20   A.   I DON'T BELIEVE IT WAS.  I THINK WE WERE JUST ASKING IN

21   GENERAL WHETHER ANY OF THE PRODUCTS THAT HE HAD DISTRIBUTED

22   RESULTED IN ANY COMPLAINTS.

23   Q.   OKAY.  AND SO YOU'RE NOT AWARE OF ANY COMPLAINTS OR

24   ADVERSE REACTIONS FROM THE TURINABOL-LV PRODUCT; CORRECT?

25   A.   I'M NOT AWARE THAT I EVER SAW ANY, CORRECT.

1    Q.   OKAY.  DID YOU DO ANY REVIEW OF THE E-MAILS THAT WERE

2    SEIZED AS A PART OF THE -- AS A PART OF THE SEARCH WARRANT IN

3    2012?

4    A.   I DON'T RECALL.

5    Q.   OKAY.  YOU HAVE A BACKGROUND AS AN IRS AGENT PRIOR TO

6    BECOMING AN FDA AGENT; IS THAT CORRECT?

7    A.   CORRECT.

8    Q.   OKAY.  AND YOU DIDN'T -- I GUESS AS PART OF THAT, THAT

9    BACKGROUND, YOU HAVE EXPERIENCE IN INVESTIGATING FINANCIAL

10   CRIMES AND FINANCIAL WRONGDOING; IS THAT ACCURATE?

11   A.   YES.

12   Q.   OKAY.  AND THERE WAS -- AS PART OF YOUR INVESTIGATION, YOU

13   DIDN'T DISCOVER ANY INDICATIONS, ANY KIND OF FLAGS THAT LED YOU

14   TO BELIEVE THAT PRIMORDIAL PERFORMANCE WAS ENGAGED IN ANY KIND

15   OF FINANCIAL WRONGDOING OR ILLEGALITY; IS THAT CORRECT?

16   A.   I DON'T RECALL BEING -- HAVING ANY INVOLVEMENT WITH THE

17   FINANCIAL INVESTIGATION OF PRIMORDIAL AT THE TIME THAT I HAD

18   IT.

19             MR. ARCHER:  OKAY.  MAY I HAVE A MOMENT, YOUR HONOR?

20             THE COURT:  GO AHEAD, PLEASE.

21        (PAUSE IN PROCEEDINGS.)

22             MR. ARCHER:  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

23             THE COURT:  ALL RIGHT.  ANY REDIRECT FROM

24   MR. PARRELLA?

25             MR. PARRELLA:  YES.

```
 1              THE COURT:  GO AHEAD.

 2                     REDIRECT EXAMINATION

 3     BY MR. PARRELLA:

 4     Q.   SO YOU WERE ASKED, MR. NOVITZKY, ABOUT THE BALCO

 5     INVESTIGATION AND WHETHER THAT BORE SIMILARITIES TO THIS

 6     INVESTIGATION.

 7     A.   YEP.

 8     Q.   CAN YOU COMMENT ON WHETHER EVERY -- WELL, WITHDRAWN.

 9          YOU'VE HAD EXPERIENCE INVESTIGATING MANY SUPPLEMENT

10     COMPANIES; IS THAT CORRECT?

11     A.   YES.

12     Q.   WERE THEY ALL THE SAME?

13     A.   NO.

14     Q.   WERE SOME OF THEM SIMILAR TO THE INVESTIGATION INVOLVING

15     PRIMORDIAL PERFORMANCE?  IN OTHER WORDS, THE CHARACTERISTICS OF

16     PRIMORDIAL PERFORMANCE?

17     A.   YES.

18     Q.   AND THE WORD THAT WAS USED BY THE DEFENDANT'S LAWYER WERE

19     "TELLTALE CHARACTERISTICS."

20          DO YOU THINK THAT'S AN ACCURATE WAY TO DEPICT THOSE

21     CHARACTERISTICS?

22     A.   TO DEPICT WHAT CHARACTERISTICS?

23     Q.   UM --

24     A.   THE THINGS THAT HE ASKED ME WHETHER OR NOT I SAW?

25     Q.   YES, THE THINGS IN BALCO.
```

1    A.   NO.  BALCO WAS COMPLETELY DIFFERENT IN THAT THE CUSTOMERS

2    OF BALCO WERE SOME OF THE HIGHEST PROFILE ATHLETES REALLY ON

3    THE PLANET.  THESE WERE ATHLETES THAT THE MEDIA SALIVATED OVER

4    TO GET INFORMATION ON.

5         SO WHEN YOU'RE TALKING ABOUT FALSE LABELS, WHEN YOU'RE

6    TALKING ABOUT CODES USED IN E-MAIL TO REFER THINGS TO, THE

7    CUSTOMERS OF BALCO HAD A LOT TO LOSE.

8         PRIMORDIAL, AS WELL AS THESE OUR SUPPLEMENT COMPANIES,

9    THEIR CUSTOMERS WERE EVERY DAY PEOPLE LIKE YOU OR I.  THEY

10   DIDN'T HAVE THAT HIGH LEVEL OF RISK AND HIGH PROFILE NATURE.

11        SO THAT'S -- YOU KNOW, BALCO WAS A WHOLE DIFFERENT ANIMAL

12   THAN PRIMORDIAL OR THE OTHER DIETARY SUPPLEMENT CASES THAT I

13   TOOK A LOOK AT.

14   Q.   SO IN SUM AND SUBSTANCE, WHILE SOME SUPPLEMENT COMPANY

15   INVESTIGATIONS MAY BE DIFFERENT THAN PRIMORDIAL, SOME WERE THE

16   SAME?  OR SIMILAR?

17   A.   CORRECT.

18   Q.   AND YOU WERE ASKED ABOUT THE 1-T TREN AND THAT -- LET'S BE

19   CLEAR.  THE -- YOUR TESTIMONY IS THAT ON THE DATE OF

20   JANUARY 24TH, 2010, THE 1-T TREN HAD NOT BEEN SCHEDULED AS A

21   CONTROLLED SUBSTANCE AT THAT POINT; IS THAT CORRECT?

22   A.   CORRECT.

23   Q.   AND COULD YOU JUST -- SINCE IT WAS BROUGHT UP IN

24   CROSS-EXAMINATION, CAN YOU JUST GIVE US WHAT YOUR UNDERSTANDING

25   IS OF NOT THE PROCESS, BUT WHAT SCHEDULING MEANS SO THE JURY

1      CAN KIND OF UNDERSTAND WHAT THAT -- WHAT THAT TERM MEANS.

2      A.   UNDER THE CONTROLLED SUBSTANCE ACT, ESPECIALLY AS IT

3      RELATES TO ANABOLIC STEROIDS, FOR THE MOST PART, THE STEROID

4      HAS TO BE SPECIFICALLY NAMED BY THE DEA TO FALL UNDER THE

5      CONTROLLED SUBSTANCE ACT.

6           AND THERE'S -- AND I SAW THIS WAY BACK IN BALCO, AND YOU

7      CONTINUE TO SEE IT TO THIS DAY, THERE ARE WHAT'S CALLED

8      DESIGNER STEROIDS OUT THERE THAT AREN'T SPECIFICALLY NAMED.  IN

9      MOST INSTANCES THEY HAVE MANY OF THE SAME CHARACTERISTICS AS

10     THE ONES THAT ARE SPECIFICALLY NAMED, BUT FRANKLY, THAT'S WHAT

11     WE'RE SEEING A LOT IN PROFESSIONAL SPORTS THESE DAYS.

12          THE CHEMISTS GET AHOLD OF THE STEROID, THEY MANIPULATE THE

13     STRUCTURE OF IT EVER SO SLIGHTLY.  IT STILL HAS THE SAME

14     EFFECT, IN SOME CASES EVEN A GREATER EFFECT IN STRENGTH

15     ENHANCEMENT.  BUT BECAUSE THE CHEMICAL HAS BEEN MANIPULATED, IT

16     NO LONGER FALLS UNDER THAT NAME OR MEANING WITHIN THE DEA LAW.

17          SO IT'S KIND OF A LOOPHOLE.  IT USUALLY TAKES A COUPLE

18     YEARS FOR THE DEA TO DO STUDIES ON IT.  THEY HAVE TO STUDY IT

19     TO MAKE SURE IT FITS CERTAIN CRITERIA, THAT IT'S MUSCLE

20     ENHANCING IN HUMANS, THAT IT'S PHARMACOLOGICALLY AND CHEMICALLY

21     RELATED TO TESTOSTERONE.

22          SO THERE'S OFTEN A LAG PERIOD FOR THE DEA TO MAKE THAT

23     REALIZATION AND CATEGORIZATION AND PUT IT AS PART OF THE

24     CONTROLLED SUBSTANCE ACT.  YOU SEE THAT GOING ON ALL THE TIME

25     OVER THE LAST 15 YEARS, REALLY SINCE BALCO.  BALCO WAS AN EARLY

1     INVESTIGATION THAT BROUGHT TO LIGHT THAT THERE ARE THESE

2     DESIGNER STEROIDS OUT THERE AND THAT PEOPLE ARE GETTING AWAY

3     WITH DISTRIBUTING THEM WITHOUT BEING SUBJECT TO THE DEA LAW BY

4     DOING THIS.

5     Q.   BY THE WAY, WHO'S THE CREATOR OF THE DESIGNER STEROID IN

6     BALCO?

7     A.   THE NAME THAT WE WERE ASKED ABOUT EARLIER, PATRICK ARNOLD.

8     PATRICK ARNOLD WAS THE CHEMIST THAT CREATED THE STEROID WHICH

9     WAS REFERRED IN BALCO, BY CODE, AS THE CLEAR.  AND THE CLEAR

10    WAS A VERY POWERFUL ORAL ANABOLIC STEROID, A COUPLE OF DROPS OF

11    WHICH WERE PUT UNDER THE TONGUE, AND MANY OF THE MOST WELL

12    KNOWN ATHLETES, YOU KNOW, REALLY IN THE WORLD WERE USING IT AND

13    GETTING GREAT PERFORMANCE ENHANCING BENEFITS FROM IT.

14         AND PATRICK ARNOLD, COINCIDENTALLY ENOUGH, HAPPENED TO BE

15    THAT CHEMIST THAT CREATED THAT STEROID THAT HAD VERY WIDE

16    RANGING IMPACT WITHIN PROFESSIONAL SPORTS IN THE EARLY 2000S.

17    Q.   SO JUST TO BE CLEAR, CONTROLLED SUBSTANCE ACT IS DIFFERENT

18    THAN THE FOOD, DRUG, AND COSMETIC ACT?

19    A.   CORRECT.

20    Q.   OKAY.  NOW, YOU TALKED ABOUT SCHEDULING.  IS IT TRUE THAT

21    THE CONTROLLED SUBSTANCE ACT ALSO HAS AN ANALOG PROVISION?

22    A.   CORRECT.

23    Q.   AND WHAT DOES THAT MEAN TO YOU?

24         MR. ARCHER:  OBJECTION.  IT CALLS FOR A LEGAL

25    CONCLUSION.

1        MR. PARRELLA:  WELL, YOUR HONOR, THIS WAS GOTTEN INTO

2   ON CROSS-EXAM.  I DID NOT GET INTO IT ON DIRECT AND I -- I'M

3   SEEKING TO CLARIFY THE CROSS-EXAM.

4        THE COURT:  OVERRULED.

5        GO AHEAD.  YOU MAY ANSWER.

6   BY MR. PARRELLA:

7   Q.   SO CAN YOU EXPLAIN YOUR UNDERSTANDING OF WHAT THE ANALOG

8   PROVISION IS?

9   A.   YEAH.  IT'S ACTUALLY CHANGED OVER TIME.  SO BACK IN THE

10  BALCO DAYS, THE ANALOG PROVISION, UNDER THE CONTROLLED

11  SUBSTANCE ACT, BASICALLY IT SAID, LOOK, HERE'S 30 NAMED

12  STEROIDS THAT ARE ILLEGAL UNDER THE CONTROLLED SUBSTANCE ACT.

13       BUT IN ADDITION TO THAT, IF A STEROID MEETS THESE

14  CRITERIA, AND IT HAD TO BE MUSCLE ENHANCING IN HUMANS AND

15  CHEMICALLY AND PHARMACOLOGICALLY RELATED TO TESTOSTERONE, THEN

16  IT COULD ALSO BE CONSIDERED A STEROID UNDER THE CONTROLLED

17  SUBSTANCE ACT IF IT MET THOSE CRITERIA.

18  Q.   EVEN IF IT WEREN'T ACTUALLY LISTED?

19  A.   EVEN IF IT WASN'T LISTED.

20  Q.   RIGHT.  AND THAT CHANGED, DID IT?

21  A.   IT DID.

22  Q.   AND HOW DID IT CHANGE?

23  A.   IT TOOK OUT THE MUSCLE ENHANCING CRITERIA BECAUSE YOU

24  COULDN'T -- YOU KNOW, YOU COULDN'T BE FEEDING THESE UNKNOWN,

25  UNTESTED DRUGS TO HUMANS TO DETERMINE WHETHER OR NOT THEY WERE

1     MUSCLE ENHANCING.

2     Q.   OKAY.

3     A.   SO UNLESS IT WAS A STEROID THAT WAS TESTED BACK IN THE

4     '50S AND '60S WHERE PHARMACEUTICAL COMPANIES OFTEN DID THIS,

5     YOU COULDN'T SHOW THE MUSCLE ENHANCING REQUIREMENT.

6          SO I FORGET WHAT YEAR IT WAS, 2009, 2010, WITH THE

7     REVISION OF THE CONTROLLED SUBSTANCE ACT, THE ANABOLIC STEROID

8     CONTROL ACT, THEY TOOK OUT THE MUSCLE ENHANCING SEGMENT FOR

9     HUMANS.

10         NOW YOU WOULD JUST HAVE TO SHOW THAT IT'S CHEMICALLY OR

11    PHARMACOLOGICALLY RELATED TO TESTOSTERONE.

12    Q.   SO IS IT ACCURATE TO SAY THAT A CHEMICAL COULD BE -- COULD

13    NOT BE LISTED AS AN ANABOLIC STEROID UNDER THE CONTROLLED

14    SUBSTANCE ACT, BUT STILL BE ILLEGAL AS AN ANABOLIC STEROID

15    BECAUSE IT FITS UNDER THE ANALOG PROVISION?

16         MR. ARCHER:  OBJECTION.  CALLS FOR A LEGAL

17    CONCLUSION, YOUR HONOR.

18         THE COURT:  SUSTAINED.

19    BY MR. PARRELLA:

20    Q.   SO LET'S MOVE ON.

21         SO LET'S KEEP THAT IN MIND AND WE'LL TALK ABOUT THE

22    1-T TREN.  CAN YOU EXPLAIN HOW THIS CONCEPT APPLIES TO

23    1-T TREN?  IN OTHER WORDS, AT ONE POINT, IT HAD NOT BEEN

24    SCHEDULED, BUT THE FDA CAME OUT WITH A DECISION.

25         MR. ARCHER:  OBJECTION.  CALLS FOR A LEGAL

1    CONCLUSION.

2           THE COURT:  YOU'VE OPENED THE DOOR.

3       GO AHEAD, PLEASE.

4       OBJECTION OVERRULED.

5       YOU MAY ANSWER.

6           THE WITNESS:  THE SUBSTANCE IN 1-T TREN WAS SCHEDULED

7    BY THE DEA IN, WAS IT JANUARY OF 2012, AS A CONTROLLED

8    SUBSTANCE, AS AN ANABOLIC STEROID, MEANING THAT IT WOULD -- THE

9    DEA DEFINITIVELY CONCLUDED THAT IT WAS CHEMICALLY AND

10   PHARMACOLOGICALLY RELATED TO TESTOSTERONE.

11   BY MR. PARRELLA:

12   Q.   BUT IT MEANS ALSO IT WENT ON THE LIST?

13   A.   IT WENT ON THE LIST.

14   Q.   BY NAME?

15   A.   IT SPECIFICALLY WENT ON THE LIST BY NAME.

16       WHAT THAT WOULD TELL ME IS PRIOR TO THAT, WHEN IT WAS NOT

17   ON THE LIST, IT STILL WAS CHEMICALLY OR PHARMACOLOGICALLY

18   RELATED TO TESTOSTERONE, SO EVEN BEFORE SPECIFICALLY BEING

19   NAMED ON THE LIST, UNDER THE CATCH-ALL PROVISION, IT COULD HAVE

20   FIT UNDER THAT CRITERIA AT THE TIME THAT IT WAS BEING

21   DISTRIBUTED.

22       THE REASON IS GOES ON THE LIST, QUITE FRANKLY, IS IT JUST

23   MAKES IT A HELL OF A LOT SIMPLER TO HAVE SPECIFICALLY ON THAT

24   LIST THAN TO HAVE TO BE ABLE TO PROVE THAT IT'S CHEMICALLY AND

25   PHARMACOLOGICALLY RELATED TO TESTOSTERONE.

```
 1              MR. PARRELLA:  THANK YOU.

 2          NOTHING FURTHER, YOUR HONOR.

 3              THE COURT:  ALL RIGHT.  ANY RECROSS?

 4              MR. ARCHER:  JUST A MOMENT, YOUR HONOR.

 5              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

 6          (PAUSE IN PROCEEDINGS.)

 7                          RECROSS-EXAMINATION

 8     BY MR. ARCHER:

 9     Q.   SO MR. NOVITZKY, ARE YOU AWARE THAT IN 2012 -- I GUESS I

10     SHOULD ASK FIRST, ARE YOU AWARE OF WHAT THE FDA OCC IS?

11     A.   YES.

12     Q.   THAT'S THE OFFICE OF CHIEF COUNSEL; CORRECT?

13     A.   THAT'S CORRECT.

14     Q.   OKAY.  AND ARE YOU AWARE THAT -- YOU'RE AWARE OF AN

15     ATTORNEY THERE NAMED JIM SMITH?

16     A.   YES.

17     Q.   OKAY.  AND ARE YOU AWARE --

18              MR. PARRELLA:  YOUR HONOR, I HAVE TO OBJECT.  CAN WE

19     HAVE A BRIEF SIDE-BAR?

20          (SIDE-BAR DISCUSSION ON THE RECORD.)

21              MR. PARRELLA:  SO I DON'T HAVE AN OBJECTION TO THE

22     QUESTION.

23          BUT SINCE THIS IS THE FIRST TIME IT'S BEEN BROUGHT UP,

24     MR. SMITH IS COUNSEL FOR FDA.  HE'S IN THE COURTROOM.  I

25     DON'T -- YOU KNOW, I JUST WANT TO MAKE EVERYONE AWARE OF THAT.
```

NOVITZKY RECROSS BY MR. ARCHER

```
 1      I'M FINE WITH LEAVING HIM SITTING IN THE GALLERY.  HE'S HERE TO

 2      OBSERVE.

 3            BUT THIS HAS NOW COME UP, AND IF THE COURT ORDERS HIM

 4      EXCLUDED, WE CAN HAVE HIM EXCLUDED, BUT I DIDN'T SEE THE POINT

 5      IN IT, BUT I DID WANT TO ALERT THE COURT.

 6            THE COURT:  I WAS GOING TO RAISE, WE DO HAVE AN

 7      EXCLUSION ORDER AND THERE HAVE BEEN A LOT OF PEOPLE WHO HAVE

 8      BEEN IN AND OUT OF THE COURTROOM AND I DON'T RECOGNIZE ANY OF

 9      THEM.  I'M ASSUMING YOU ALL ARE POLICING THAT.

10            MR. ARCHER:  I'M VERY CONCERNED BY THAT.  HE'S A

11      POTENTIAL FACT WITNESS IN THE CASE.

12            SO JUST TO PROFFER FOR THE COURT WHAT HE DID, IN 2012, HE

13      WAS CONSULTING WITH AGENT RICKHER AND TOLD HER THAT HE DID NOT

14      FIND --

15            THE COURT:  YOU KNOW WHAT?  LET'S GET THE JURY OUT OF

16      THE COURTROOM.  I DON'T WANT -- IS THIS GOING TO BE AN INVOLVED

17      CONVERSATION?  I'M CONCERNED THEY'RE GOING TO HEAR THIS.

18            MR. PARRELLA:  WE CAN CUT TO THE CHASE AND I'LL HAVE

19      HIM EXCLUDED.  I JUST WANTED TO MAKE SURE THAT THE COURT --

20            THE COURT:  YOU WANT HIM EXCLUDED?

21            MR. ARCHER:  YEAH.

22            THE COURT:  IS HE ON YOUR WITNESS LIST?

23            MR. PARRELLA:  NO, WE WEREN'T PLANNING ON CALLING

24      HIM.  THIS IS THE FIRST TIME THAT THE NAME WAS MENTIONED IN THE

25      TRIAL AND THAT'S WHY I WANTED TO LET THE COURT KNOW.
```

```
 1              MR. ARCHER:  SO HE'S -- I MEAN, HE'S --

 2              THE COURT:  YOU JUST WANT HIM EXCLUDED?  IT SOUNDS

 3    LIKE YOU'RE GETTING NO OPPOSITION FROM THE GOVERNMENT.

 4              MR. ARCHER:  NO, I HAVE NO PROBLEM WITH THAT.

 5         I'M JUST A LITTLE SURPRISED THAT HE'S HERE.  WHAT I'M

 6    ABOUT TO ASK IS HE MADE A LEGAL DETERMINATION THAT THE

 7    PRIMORDIAL PERFORMANCE PRODUCTS WERE NOT IN VIOLATION OF THE

 8    FDCA AND THAT THERE WAS NO -- THERE WAS NO CASE IN 2012.

 9              THE COURT:  WELL, IF HE'S NOT ON THE WITNESS LIST,

10    WHY ARE YOU SURPRISED THAT HE'S HERE?  HE HAS A RIGHT TO BE

11    HERE, RIGHT?  IT'S A PUBLIC PROCEEDING.

12              MR. ARCHER:  BUT HE'S AN FDA EMPLOYEE AND HE'S A FACT

13    WITNESS IN THE CASE POTENTIALLY.

14              MR. SPRINGSTEEN:  BUT THAT DETERMINATION WAS LATER

15    CHANGED AND IT WAS DETERMINED THAT THERE WERE CONCERNS ABOUT

16    THE PRODUCTS AND THAT'S WHY THE INVESTIGATION CONTINUED.

17              THE COURT:  OKAY.  IT SOUNDS LIKE THEN YOU SHOULD ASK

18    HIM TO STEP OUT FOR THIS TESTIMONY.

19              MR. PARRELLA:  I'D KIND OF LIKE NOT --

20              THE COURT:  WHY DON'T WE JUST TAKE A FIVE MINUTE

21    BREAK?

22              MR. PARRELLA:  WELL, WE'RE CLOSE TO FINISHING WITH

23    THIS WITNESS AND THEN WE HAVE ANOTHER WITNESS --

24              THE COURT:  READY TO GO?

25              MR. PARRELLA:  -- TO GET ON.
```

```
 1                 THE COURT:  OKAY.  THAT'S FINE.  OKAY.  THAT'S FINE.

 2            (END OF DISCUSSION AT SIDE-BAR.)

 3                 THE COURT:  ALL RIGHT.  LET'S CONTINUE WITH THE

 4       RECROSS OF MR. NOVITZKY.

 5            GO AHEAD, PLEASE, MR. ARCHER.

 6                 MR. ARCHER:  THANK YOU, YOUR HONOR.

 7       Q.   ARE YOU AWARE THAT IN 2012, I BELIEVE IT WAS AROUND

 8       FEBRUARY OR MARCH OF 2012, AS PART OF THE INVESTIGATION, THERE

 9       WAS CONSULTATION WITH THE OCC ABOUT THE LEGALITY OF

10       PRIMORDIAL PERFORMANCE'S PRODUCTS?  DO YOU RECALL THAT?

11       A.   I DON'T RECALL THAT SPECIFICALLY.

12       Q.   OKAY.  DO YOU RECALL THAT THE OPINION FROM THE OCC, FROM

13       JIM SMITH --

14                 MR. PARRELLA:  OBJECTION.  HE SAID HE DIDN'T RECALL.

15                 THE COURT:  SUSTAINED.

16                 MR. ARCHER:  OKAY.

17       Q.   SO YOU HAVE NO RECOLLECTION OF ANY CONSULTATION WITH

18       JIM SMITH ABOUT THIS CASE?

19       A.   I DIDN'T SAY THAT.

20       Q.   OKAY.  SO DO YOU RECALL ANY OPINIONS ABOUT THIS CASE FROM

21       JIM SMITH?

22       A.   NO.

23                 MR. ARCHER:  OKAY.  NO FURTHER QUESTIONS.  THANK YOU.

24                 THE COURT:  ALL RIGHT.  IS THERE ANY REDIRECT OF

25       MR. NOVITZKY.
```

NOVITZKY RECROSS BY MR. ARCHER

1          MR. PARRELLA:  NO, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

3          MR. PARRELLA:  YES, YOUR HONOR.

4          THE COURT:  AND IS IT SUBJECT TO RECALL OR NOT

5     SUBJECT TO RECALL?

6          MR. PARRELLA:  I WOULD ASK NOT SUBJECT TO RECALL.  HE

7     DOES NOT LIVE IN THE DISTRICT.  HE HASN'T BEEN SUBPOENAED BY

8     THE DEFENSE.

9          THE COURT:  OKAY.

10          MR. ARCHER:  NO OBJECTION.

11          THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED, NOT

12     SUBJECT TO RECALL, WHICH MEANS YOU HAVE COMPLETED YOUR

13     TESTIMONY FOR THIS TRIAL.

14          THE WITNESS:  THANK YOU, YOUR HONOR.

15     ///

16     ///

17

18

19

20

21

22

23

24

25

1

2

3                       CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  AUGUST 17, 2017

19

20

21

22

23

24

25